CONSUMERS ORGANIZATION FOR FAIR ENERGY EQUALITY, INC. & others *vs.* DEPARTMENT OF PUBLIC UTILITIES & others.

Suffolk.    May 8, 1975. — September 11, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Public Utilities.    Constitutional Law,* Public utilities, Due process of law, Right to hearing.   *Equity Pleading and Practice,* Parties.

The Department of Public Utilities was not required by G. L. c. 164, § 94, as amended through St. 1973, c. 816, § 2, to hold a public hearing with respect to increases in charges billed to customers by electric companies pursuant to unchanged "fuel adjustment clauses" in their rate schedules, based on the cost of fuel and com-

puted mathematically according to formulae fixed in the clauses; the provision of St. 1973, c. 816, § 2, requiring the department to hold a public hearing on any "general increase in rates, prices and charges for . . . electric service" was inapplicable. [601-608]

With respect to increases made without notice to customers or public hearing by electric companies in charges under unchanged "fuel adjustment clauses" in their rate schedules, the customers had opportunities to question the increases which satisfied any constitutional due process requirements where the fact of the increases was apparent on the face of the bills rendered and procedure was available under G. L. c. 164, § 93, for a public hearing and reduction or change in price by the Department of Public Utilities, subject to court review, and procedure was available under a regulation of the department for a hearing and decision by it on any question regarding the fuel adjustment clause, subject to court review. [608-611]

Individuals who appeared as complainants in proceedings before the Department of Public Utilities were proper petitioners upon an appeal under G. L. c. 25, § 5, from orders of the department, but an organization of which they were "members" which was not a party to the departmental proceedings was not a proper party to the appeal. [611-612]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on February 3, 1975.

The case was reserved and reported by *Kaplan,* J.

*Richard A. Young* for Consumers Organization for Fair Energy Equality, Inc. & others.

*Edward B. Hanify* (*William G. Meserve & John J. Desmond, III,* with him) for Boston Edison Company & another; *Robert G. Bleakney, Jr., & Robert V. Cauchon* for Brockton Edison Company & another; *Philip H. R. Cahill* for Massachusetts Electric Company; *Franklin M. Hundley* for New Bedford Gas and Edison Light Company; *Robert S. Cummings, Maurice L. Zilber & Richard L. Morningstar,* for Western Massachusetts Electric Company, also with him.

*Alan K. Posner,* Assistant Attorney General, for the Department of Public Utilities.

KAPLAN, J. We defer to point 3 of this opinion a consideration of certain procedural objections to the

368 Mass. 599                                            601

Consumers Org. for Fair Energy Equality *v.* Department of Pub. Util.

maintenance of the present appeal. If, as we shall conclude, the procedural problems are not serious, then we have to decide on the merits, on reservation and report of a single justice of this court, a petition for appeal under G. L. c. 25, § 5, by Consumers Organization for Fair Energy Equality, Inc. ("COFFEE") and 415 residential customers of six electric companies (named as respondents herein) from a final decision or order of the Department of Public Utilities (also named as a respondent) published on January 29, 1975. The decision (D. P. U. dockets 18,209 and 18,221) terminated an "adjudicatory proceeding" in which the petitioners contended that increases in rates for electricity, billed to the petitioners by the electric companies in pursuance of "fuel adjustment clauses" in their rate schedules, were illegal because no public hearings had been held by the department under G. L. c. 164, § 94, in connection with the imposition of those increases.[1] The petitioners say that § 94, properly interpreted, called for public hearings, and in any event due process required them. Apparently the petitioners limited their attack to the increases that went into effect from January 1, 1973, to July 26, 1974.[2] We agree with the department that the petitioners' contentions fail. There is no problem after July 26, 1974, because of new legislation that went into force that day.[3]

1. Fuel adjustment clauses have appeared in electric utility rate schedules in this country for many years. A

---

[1] There is no claim that the fuel adjustment clauses were not properly approved as part of the rate schedules of the companies, or that there was mathematical error in the amounts billed which resulted from application of the formulas set out in the fuel adjustment clauses.

[2] That the petitioners so limited their attack was noted by the single justice in memorandum after hearing the parties to the appeal. See p. 614 below. In fact, as we shall see, the logic of the petitioners' argument as to § 94 seems rather to look to the period from December 20, 1973, the effective date of an amendment of § 94, to July 26, 1974.

[3] As to this legislation, see p. 615 below.

need for them was felt during the first World War and they have been with us ever since, although the wisdom of their use has been regularly a subject of controversy.[4] Such a clause provides typically for the fluctuation upward or downward of the rates charged to customers reflecting, in accordance with formula, changes from a defined base in the cost to the company of the fuel used by it to generate power. It is a "pass-through" provision operating in terms of a mathematical formula. We need not go into the complexities and variations of these clauses since we face a general question that applies to fuel adjustment clauses regardless of their precise details.[5]

---

[4] The practical arguments for and against the use of "escalator" clauses in utility rate schedules (not limited to fuel adjustment clauses but including, for example, "purchased gas adjustment clauses" in the rate schedules of gas companies) will be found in Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U. of Pa. L. Rev. 964, 965-974 (1958); Foy, Cost Adjustment in Utility Rate Schedules, 13 Vand. L. Rev. 663, 668-672 (1960). See the discussion in *Complaint of Trustees of Villages of Saugerties and Ellenville,* N. Y. Pub. Serv. Comm. Op. No. 75-5, March 21 1975; also Pashman, J., dissenting, in *In re Board's Investigation of Tel. Cos.* (*Rate Counsel* v. *New Jersey Bell Tel Co.*), 66 N. J. 476, 496 (1975) (the majority opinion expressed approval of a "comprehensive adjustment clause" applicable to all the major costs of the company). We have no occasion to express any views as to the business merits of adjustment clauses.

[5] Some idea of the variety of these clauses is conveyed by Trigg, n. 4 above, at 974-989. The following is a fairly simple fuel adjustment clause with a "neutral zone" feature (quoted from Mass. D. P. U. 16,482, August 13, 1970):

"FUEL ADJUSTMENT: Whenever in any month the cost of fossil fuels priced alongside the Company's electric generating stations is greater than $8.20 or less than $8.05 per ton of 29,000,000 British Thermal Units, an additional charge or deduction will be applied to the kilowatt hours which are billed in the second succeeding billing month.

"This charge or deduction will be determined by multiplying the increase of each full cent above $8.20 or the decrease of each full cent below $8.05 by 0.00039 and by the ratio of kilowatt hours generated by fossil fuels to total kilowatt hours generated and purchased in that month.

"In determining the cost of fossil fuel used in any month, the cost of the fossil fuel received during the month will be averaged with the cost of fossil fuel in storage at the beginning of the month."

368 Mass. 599 603

Consumers Org. for Fair Energy Equality v. Department of Pub. Util.

Before its amendment by St. 1973, c. 816, § 2, effective December 20, 1973, § 94 of c. 164, stating that gas and electric companies must file with the department "schedules . . . showing all rates, prices, and charges to be thereafter charged or collected," as well as changes in those schedules, did not set out any requirement of a public hearing in connection with departmental proceedings at which the tariffs and changes of tariffs were considered. And so, even if increases of rates to customers pursuant to a fuel adjustment clause (as distinguished from any change in the clause itself) could be regarded as within the phrase "schedules . . . showing all rates," and so forth, it could not be said that § 94 compelled a public hearing in respect to those increases.

The 1973 amendment of § 94 came about through an episode involving the New England Telephone and Telegraph Company. The department in 1972 approved a change of the rate schedules of that company in a departmental proceeding without a public hearing (there was no problem of any cost adjustment clause). This provoked some agitation for an amendment of c. 159, § 20,[6] a section somewhat comparable to c. 164, § 94, and both sections were duly amended, the amendment of § 94 taking effect, as we have indicated, on December 20, 1973. As amended, § 94 provides that "[w]henever the department receives notice of any changes proposed to be

---

[6] While an appeal from the results of a departmental rate proceeding affecting New England Telephone and Telegraph Company was pending in this court, the company filed a new schedule instituting a fresh proceeding. The appeal was then decided. *New England Tel. & Tel. Co. v. Department of Pub. Util.* 360 Mass. 443 (1971). Noting that the new proceeding involved some of the points ruled on in the appeal, the department abbreviated the proceeding without any call for a public hearing. *Re New England Tel. & Tel. Co.* 93 P. U. R. 3d 514 (1972) (Mass. D. P. U.). The Attorney General, in response to an inquiry, stated that G. L. c. 159, § 20, did not require a public hearing. Rep. A. G., Pub. Doc. No. 12 (1972) 91. Apparently this led to the enactment of the 1973 amendments of § 20 and c. 164, § 94, by St. 1973, c. 816, § 1 and § 2, respectively.

made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes after first causing notice of the time, place and the subject matter of such hearing to be published at least twenty-one days before such hearing in such local newspapers as the department may select." The petitioners argue that this language should be read as requiring a public hearing for such increase[7] which comes about through application of the formula of a fuel adjustment clause in a schedule on file.

In the opinion accompanying its decision herein, the department dealt with the matter as follows: "Petitioners argue that statutes 1973, Chapter 816, Section 2, amending General Laws, Chapter 164, Section 94, effective September 21, 1973 [*sic*: the proper date is December 20, 1973], changed the then existing statutory law and made a hearing mandatory for any 'general increase in rates, prices and charges' for electric service. We believe that this amendment required hearings for changes in any company's Fuel Clause itself, but not for mathematical variations pursuant to such a clause. A fuel clause obviously contemplates changes in the dollar amount (expressed as a decimal) that appears on a consumer's bill; such a figure will fluctuate upward and downward according to the cost of fuel, computed according to the formulae. As long as the clause (the formulae) remains fixed, the mathemathics resulting from the clauses' operation do not constitute a 'general increase in rates, prices and charges.' We believe that, prior to July 26, 1974, no hearings were required for mathematical fluctuations pursuant to approved Fuel Adjustment

---

[7] In our discussion we forgo the point that an increase under a fuel adjustment clause, even if an increase within the quoted amendatory language, might not be a "general" increase.

Clauses." The departmental interpretation is matched by this court's remarks in *Century Cab Inc.* v. *Commissioner of Ins.* 327 Mass. 652, 664 (1951), where we said of a feature of an insurance rate expressed not in dollars and cents but in terms of a formula, "A rate may be fixed where its elements are settled and where all that remains to be done is to combine those elements by the employment of a definite rule, or as here by mathematical process . . . [citing cases]."

The department's view reflects long administrative understanding and practice. On the one hand, rate proceedings conducted by the department have comprised discussions of and decisions upon the desirability and content of cost adjustment clauses, and changes in those clauses, set out in proposed schedules of rates.[8] See, e.g., *Re Arlington Gas Light Co.* 74 P. U. R. (N. S.) 442 (1948) (Mass. D. P. U.); *Re Worcester Gas Light Co.* 9 P. U. R. 3d 152 (1955) (Mass. D. P. U.); *Re Plymouth County Elec. Co.* 18 P. U. R. 3d 315 (1957) (Mass. D. P. U.); D. P. U. 16,482 (August 13, 1970). Cf. *Boston Consol. Gas Co.* v. *Department of Pub. Util.* 321 Mass. 259 (1947). On the other hand, there is no past instance that has been cited to us or that we have found where a change or impending change in the dollar amount of a rate, occasioned by application of the formula of a cost adjustment clause, has itself been the subject of a rate proceeding before the department. That the 1973 amendment of § 94 called for public hearings where certain changes of schedules were being proposed did not alter the understanding that an increase of rate in pursuance of a cost adjustment clause appearing in a filed schedule was not the proper subject of a departmental proceeding under that section. But a pro-

---

[8] In D. P. U. 12,096 (November 7, 1957), the department published an order "revising order of the Department issued March 19, 1946 (D. P. U. 7357), establishing uniform general principles and terms relative to fuel clauses in rate schedules of electric companies."

posal that an adjustment clause be added to a schedule, or that a clause in an existing schedule be modified, could be dealt with in such a proceeding, now with the requirement, in certain cases, of a public hearing.

These observations are reinforced when one considers the main historic purpose of cost adjustment clauses as conventionally stated. Rate proceedings have been notoriously slow as well as expensive. In times of inflation, dependence on lumbering rate proceedings to accommodate the rates to rapidly increasing costs would threaten utilities with unrecoverable expenditures destructive of reasonable returns. Therefore the demand arose to build into the rates, provisions by which increases in certain costs to the utilities (and, to be fair, decreases as well) would in accordance with formula be automatically passed on to the consumers as fluctuations of the charges to them, without the burden and expense to utilities — which would ultimately fall upon consumers — of instituting and carrying out separate rate proceedings to justify the varying charges.[9] Automatic adjustment made particular appeal where the utility had only minimal bargaining power about the particular items of cost (e.g., a gas company purchasing natural gas from a supplier whose rates were fixed by the Federal Power Commission), or where the State regulatory agency believed it could keep a close watch on the particular costs (e.g., an electric company purchasing coal or oil to generate power, the purchase contracts being under continual effective scrutiny by the State agency). See *Chicago* v. *Illinois Commerce Commn.* 13 Ill. 2d 607, 614-616 (1958); *Re Providence Gas Co.* 88 P. U. R. 3d 430, 433-434 (R. I. Pub. Util. Commn. 1971). If we have stated correctly the conventional rationale for the appearance of cost adjustment clauses in rate schedules, it would seem incongruous to subject fluctuations of charges

---

[9] See Trigg, n. 4 above, at 967-968; Foy, n. 4 above, at 663.

to consumers under these clauses to rate proceedings under such a statute as § 94; the clauses were designed precisely to avoid those proceedings except where changes were being proposed in the clauses themselves.

Lastly, we observe that authority in other States is consistent with and supports the basic position that fluctuations of charges to consumers under a cost adjustment clause are not, in the characteristic legislative pattern, changes in the schedule of rates invoking rate proceedings with any incident hearings. See *Chicago* v. *Illinois Commerce Commn., supra*; *United Gas Corp.* v. *Mississippi Pub. Serv. Commn.* 240 Miss. 405 (1961); *Akron* v. *Public Util. Commn. of Ohio,* 5 Ohio St. 2d 237 (1966); *Norfolk* v. *Virginia Elec. & Power Co.* 197 Va. 505 (1955); *Re Brooklyn Borough Gas Co.* 100 P. U. R. (N. S.) 271 (1953) (N. Y. Pub. Serv. Commn.); *Complaint of Trustees of Villages of Saugerties and Ellenville,* N. Y. Pub. Serv. Commn. Op. No. 75-5, March 31, 1975.[10] But cf. *In re Petition of Allied Power & Light Co.* 132 Vt. 354 (1974).[11] The most familiar statement is that of Commissioner Catterall of the Virginia State Corporation Commission, adopted by the court in the *Norfolk* case, *supra.* His remarks, quoted in

---

[10] The New York Commission, while indicating that avoidance of excessive "regulatory lag" is a central purpose of cost adjustment clauses, went on to say that a certain amount of lag in the adjustment of rates to cost under these clauses is desirable in order to keep the companies on their toes and alert to improve their efficiency. As to the function of "lag," see 2 Kahn, Economics of Regulation: Principles and Institutions, 48, 59-60 (1971); Scherer, Industrial Market Structure and Economic Performance, 528-529 (1970).

[11] The Vermont court disapproved a rule of the public service board authorizing any electric company to include a power and fuel adjustment clause in its rate schedule. One of the court's grounds appears to be that such a general rule is inconsistent with the statutes requiring changes in a company's rate schedule to be made the subject of a rate proceeding as to that company. This is not inconsistent with the other authority cited in the text. Other remarks in the court's opinion may be referable to the particular statutory arrangements.

the margin,[12] parallel those of the department in its opinion in the present case.

2. The petitioners herein make a constitutional claim that, apart from what § 94, as amended, may be held to mean, due process entitled them as consumers to hearings concerning the several increases of charges made by the respondent electric companies under their respective fuel adjustment clauses. We need not pause to undertake an analysis of the respondents' broad argument that rate-payers have no "vested property right" in the charges for service that they are obliged to pay, so that, presumably, they are entitled to no procedural safeguards with respect to the exaction of increases in those charges.[13] Nor need we consider whether the consumers' potential right to intervene in the rate proceeding in which the particular cost adjustment clause is proposed for inclusion in a rate schedule, is itself enough to afford them due process.[14] We think the petitioners had additional opportunities to question the increases that satisfied any due process requirements. To be sure, the particular increases were made without notice to the consumers or public hearing.

[12] "The legislature has, by the language quoted, recognized that rate schedules consist not merely of lists of rates in dollars and cents, but that they customarily include provisions that will in various ways affect the rates charged at the time of filing or to be charged thereafter." Catterall, Commr., in *Re Lynchburg Gas Co.* 6 P. U. R. 3d, 33, 37 (1954) (Va. State Corp. Commn.), quoted in the *Norfolk* case, 197 Va. at 516 (1955). The commissioner continued (at 37): "The thing that the statute says must be filed is not every change in the consumers' bills, but every change in the schedules that affects the computation of the bills. A charge that can be computed by a fixed mathematical formula is as firmly fixed as a charge that is stated in terms of money."

[13] See the majority and dissenting opinions in *Georgia Power Co. v. Allied Chemical Corp.*, Sup. Ct. Ga., No. 29,180, January 28, 1975. See also *Public Util. Commn. of Cal. v. United States*, 356 F. 2d 236 (9th Cir. 1966); *Rivera v. Chapel*, 493 F. 2d 1302, 1304 (1st Cir. 1974).

[14] See *Norfolk v. Virginia Elec. & Power Co.* 197 Va. 505, 518 (1955).

However, the fact of the increases, with intimations of possible further increases, was apparent on the face of the bills rendered. A procedure existed by which the petitioners could compel official hearing of their grievances. If they believed the fuel adjustment clauses were inherently improvident or were resulting in excessive returns to the companies; if they doubted the propriety of any features of the clauses or thought the calculations under the clauses were erroneous; if they had any relevant objections, they had available to them G. L. c. 164, § 93, as appearing in St. 1963, c. 615, § 4. This states broadly that any twenty customers of a company may file written complaint "either as to the quality or price" of the electricity furnished, whereupon the department is required to give appropriate notice and hold a public hearing and order any suitable change of price or improvement of quality. The department may also proceed on its own motion under § 93.[15]  In either case there is court review.

But it appears further from the department's handling of the present case, to which we shall refer immediately below, that the department has also afforded procedures cumulative to § 93 by which consumers could attack increases of charges by the companies. The short of the matter is that the petitioners and any consumers similarly

---

[15] Section 93 provides: "On written complaint of the attorney general, of the mayor of a city or the selectmen of a town where a gas or electric company is operated, or of twenty customers thereof, either as to the quality or price of the gas or electricity sold and delivered, the department shall notify said company by leaving at its office a copy of such complaint, and shall thereupon, after notice, give a public hearing to such complainant and said company, and after such hearing may order any reduction or change in the price or prices of gas or electricity or an improvement in the quality thereof, and a report of such proceedings and the result thereof shall be included in the report required by section seventy-seven. Such an order may likewise be made by the department, after notice and hearing as aforesaid, upon its own motion. The price or prices fixed by any such order shall not thereafter be changed by said company except as provided in section ninety-four."

situated had means of taking the initiative and directing the department's attention to their complaints about billing increases. That some initiative was called for does not suggest unfairness especially when it is considered that the department has a continuing protective duty toward consumers which it is bound to discharge even without prodding by them.

In the present case, the department joined for hearing and decision D. P. U. 18,209 and 18,221. Number 18,209 was a proceeding instituted by some of the present petitioners under departmental "Regulations on Billing and Termination Procedures for Residential Customers of Gas and Electric Companies" (Regulation 16,696), published on September 4, 1973, following the decision of this court in *Cambridge Elec. Light Co.* v. *Department of Pub. Util.* 363 Mass. 474 (1973). Under Regulation 16,696, a customer may, prior to termination of service for nonpayment of a billing, notify a representative of the company that "any matter related to a billing is disputed, including, without limitation, the accuracy of the amount of the bill or the proper party to be billed." The customer is then entitled to investigation of the grievance by a company-designated complaint officer, followed, if necessary, by a nonadjudicatory hearing before a hearing officer of the department, whose decision is subject to review in an adjudicatory hearing[16] by the department itself. Meanwhile, service continues. The "matter related to a billing" disputed in D. P. U. 18,209 was evidently the validity of increases under the relevant fuel adjustment clauses. D. P. U. 18,221 was an application by the other present petitioners, made direct to the department, for a hearing on the same subject matter. Waiving, apparently, as to the latter group, the step-by-step procedures of Regulation 16,696, the department heard D. P. U. 18,209 and 18,221 together, and rendered

---

[16] "Adjudicatory" within the meaning of the State Administrative Procedure Act, G. L. c. 30A, §§ 1 (1), 10.

368 Mass. 599                                                        611

Consumers Org. for Fair Energy Equality *v*. Department of Pub. Util.

its decision, from which the present appeal was taken.[17] Regulation 16,696 is thus seen to be a method of obtaining hearing and decision by the department on any question regarding the fuel adjustment clause, that decision being subject to review in this court under c. 25, § 5. Due process is again served. See the discussion in *Sellers* v. *Iowa Power & Light Co.* 372 F. Supp. 1169, 1173-1174 (S. D. Iowa 1974).

3. A petition for appeal under c. 25, § 5, was first filed herein by "COFFEE," a nonprofit corporation claiming as "members" a large number of customers of electric companies, including the present petitioners. The respondent companies and the D. P. U.[18] moved to dismiss the petition on several grounds, of which the more material were: that as "COFFEE" was not a party to or intervener in the departmental proceedings, it could not act as petitioner on the appeal; that the department was a necessary or indispensable party to the appeal, but had not been joined; that the petition did not state a claim for appeal, as it seemed to attack Regulation 16,696 (the validity of which, according to the respondents, was established by the *Cambridge Electric* case, *supra*), and not the decision in D. P. U. 18,209 and 18,221, and was in any event grievously unclear or ambiguous. The motions to dismiss were argued to the single justice, who ordered that the department be joined as a party to the appeal, and suggested in memorandum that the petition for appeal be amended to meet the companies' other criticisms. An amended petition was filed, pursuant to leave, adding as parties the individuals

---

[17] Regulation 16,696 provides expressly that "[p]ending final determination of the appeal by the Department, the Department may enter any temporary orders to the company or to the customer which it deems just and equitable."

[18] Fitchburg Gas and Electric Light Company was named in the petition as a party respondent but, as it had not been named in the proceedings below, the single justice allowed a motion to dismiss it from the appeal.

who had appeared as complainants in the departmental proceedings, and directing its fire at the departmental decision in D. P. U. 18,209 and 18,221. The companies then renewed, in effect, their motion to dismiss, now addressed to the amended petition for appeal, and the motions, together with the appeal proper, the single justice reserved and reported to the full court. The amended petition suffices as a pleading when read with an indulgent eye in the light of the single justice's memorandum (consider the teaching of *Charbonnier* v. *Amico*, 367 Mass. 146 [1975]); and the individual petitioners are proper petitioners, though "COFFEE" is not. Accordingly, the respondent companies' motions are unavailing except as to the dismissal of "COFFEE," see *Save the Bay, Inc.* v. *Department of Pub. Util.* 366 Mass. 667, 673-674 (1975), and, reaching the merits, we shall affirm the decision appealed from. As we hold that the petitioners fail on the merits, we do not decide what remedy they would be entitled to if they had succeeded.

4. We add that the precise problem of the present case is not likely to recur. Statute 1974, c. 625, § 1, effective July 26, 1974, adds a new § 94G to c. 164, dealing with the uniform calculation and billing of fuel charges by electric companies. It provides among other things that "[i]n no event shall a fuel charge be billed to customers which has not been specifically approved by the department after a public hearing."[19] The fact that this legislation was thought to be necessary tends to confirm our interpretation of § 94, as amended. Implicitly, this

---

[19] Chapter 625 provides in § 3 that the department shall investigate the "appropriateness" of all fuel charges imposed by electric companies after January 1, 1973, report the results of the investigation by the first Wednesday in December, 1974, and order rebates to customers if fuel charges between January 1, 1973, and July 26, 1974, were not in accordance with D. P. U. 12,096 of 1957 (see n. 8 above) or any other lawful order of the department then in effect. It is understood that the department requested extensions of time to make its report.

innovative statute bespeaks a confidence that the hearing procedure can be carried through with despatch, so that a main object of these clauses, the timely adjustment of rates to costs, will not be defeated.

"COFFEE" will be dismissed as a petitioner on this appeal. The department's decision will be affirmed.

*So ordered.*