PEOPLE'S COUNSEL OF the DISTRICT OF COLUMBIA, Petitioner,

v.

PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent,

Potomac Electric Power Company, Intervenor.

No. 82–424.

District of Columbia Court of Appeals.

Argued Nov. 30, 1982.

Decided Jan. 31, 1984.

Brian Lederer, Washington, D.C., with whom Elizabeth A. Noel, John T. Schell, Michael W. Beasley and Mark D. Colley, Washington, D.C., were on brief, for petitioner.

Michael E. Geltner, Washington, D.C., with whom Lloyd N. Moore, Jr., Michael D. Newsom and Roberta Willis Sims, Washington, D.C., were on brief, for respondent.

* Judge Kelly was an Associate Judge of this court at the time of argument. She retired from the court on March 31, 1983, and did not participate in the disposition of this appeal.

William Dana Shapiro, Washington, D.C., with whom Edward A. Caine, Betty K. Cauley and Sylvia L. Bateman, Washington, D.C., were on brief, for intervenor.

Before NEWMAN, Chief Judge, TERRY, Associate Judge, and KELLY, Associate Judge, Retired.*

TERRY, Associate Judge:

The People's Counsel appeals from an order of the Public Service Commission in which the Commission ruled that it had authority to approve the use of automatic fuel adjustment clauses by the Potomac Electric Power Company and that such clauses did not amount to retroactive ratemaking. We reject petitioner's arguments and affirm the Commission's order.

I

In August 1979 the Public Service Commission issued a public notice of its intention to conduct an investigative and evidentiary hearing "for the purpose of reviewing and evaluating the reasonableness of Potomac Electric Power Company's (PEPCO) fuel adjustment clauses." At a prehearing conference the Commission considered petitions for leave to intervene and established a hearing schedule and ground rules for the upcoming proceeding. Following the conference, PEPCO, People's Counsel, and the Commission's staff filed testimony and exhibits. After eight days of hearings, the record was closed on July 30, 1980.

On April 10, 1981, the Commission issued Proposed Opinion and Order No. 7291,[1] in which it ruled that it had the power to authorize the use of fuel adjustment clauses in rate designs and that such clauses were fixed rates and did not constitute retroactive ratemaking. The Commission further found that PEPCO's fuel adjustment clauses were just, reasonable, and nondiscriminatory. People's Counsel filed exceptions to the proposed order.

1. A majority of the Commissioners did not hear all of the evidence in the case; thus, under D.C.Code § 1–1509(d) (1981), the Commission's order was "proposed" rather than "final."

On December 23, 1981, the Commission entered Final Opinion and Order No. 7428. That order reaffirmed the Commission's earlier ruling in Proposed Order No. 7291 that it had "substantive authority to approve automatic fuel adjustment clauses." Moreover, Order No. 7428 emphasized that "[a]pproval by the Commission of a fuel adjustment clause render[ed] it applicable to fuel consumed in the future to produce energy. There [was] no element of retroactive ratemaking involved." People's Counsel's application for reconsideration of Order No. 7428 was subsequently denied by the Commission. From that denial People's Counsel appeals.

Petitioner challenges the Commission's decision on two grounds. First, petitioner maintains that the Commission exceeded the scope of its statutory authority by permitting PEPCO to use an automatic fuel adjustment clause in its rate design. In particular, petitioner contends that the fuel adjustment clause is contrary to the fundamental policies and regulatory scheme of the District of Columbia Public Utilities Act and inconsistent with the system of fixed rates which that act requires. Second, petitioner argues that the adoption of a fuel adjustment clause constitutes retroactive ratemaking because it provides for a dollar-for-dollar recovery of past fuel costs and reimburses PEPCO for them.

## II

■ It is the Commission, not this court, which has the responsibility for setting utility rates and establishing rate designs. D.C.Code §§ 43–501, 43–601, 43–611 (1981); *United States v. Public Service Comm'n,* 465 A.2d 829, 832 (D.C.1983); *Metropolitan Washington Board of Trade v. Public Service Comm'n,* 432 A.2d 343, 350 (D.C.1981); *Washington Public Interest Organization v. Public Service Comm'n,* 393 A.2d 71, 75 (D.C.1978), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). In fulfilling that responsibility, the Commission must "arriv[e] at a fair balance between competing consumer and investor interests." *People's Counsel v. Public Service Comm'n,* 399 A.2d 43, 45 (D.C.1979); *accord, People's Counsel v. Public Service Comm'n,* 455 A.2d 391, 393 (D.C.1982).[2] Judicial review of a Commission order is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless ... such findings ... are unreasonable, arbitrary, or capricious." D.C.Code § 43–906 (1981). *See, e.g., People's Counsel v. Public Service Comm'n,* 455 A.2d 402, 403 (D.C.1982).[3] In discussing the scope of federal court review of decisions by the Federal Power Commission, the Supreme Court has said:

It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.[4]

2. Specific rates and rate designs approved by the Commission must be "reasonable, just, and nondiscriminatory." D.C.Code § 43–501 (1981). As a result, the Commission's ratemaking decisions are insulated from judicial review if they fall within a zone of reasonableness. "From the investor standpoint, courts have defined the lower boundary of this zone of reasonableness as 'one which is not confiscatory in the constitutional sense.' ... From the consumer standpoint, the upper boundary cannot be so high that the rate would be classified as 'exorbitant.' " *Metropolitan Washington Board of Trade v. Public Service Comm'n, supra,* 432 A.2d at 350 (citations omitted).

3. D.C.Code § 43–905 (1981) gives this court "jurisdiction to hear and determine any appeal from an order or decision of the Commission." This court's review of a Commission order, however, "is the narrowest judicial review in the field of administrative law." *Potomac Electric Power Co. v. Public Service Comm'n,* 402 A.2d 14, 17 (D.C.) (en banc) (citations omitted), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979).

4. This court's authority to review the Commission's orders is comparable to that exercised by the federal courts when reviewing orders of the Federal Energy Regulatory Commission and its predecessor, the Federal Power Commission.

*FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), quoted in *Washington Gas Light Co. v. Public Service Comm'n,* 450 A.2d 1187, 1193 (D.C.1982). The Court went on to observe that a rate order, as "the product of expert judgment," was presumptively valid, and would be overturned only upon a "convincing showing" that it failed to meet the statutory criteria. *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. at 288.[5]

■ The Commission's authority is not untrammeled. It "has the burden of showing fully and clearly why it has taken the particular ratemaking action." *Washington Public Interest Organization v. Public Service Comm'n, supra,* 393 A.2d at 75; *accord, Metropolitan Washington Board of Trade v. Public Service Comm'n, supra,* 432 A.2d at 351.[6] However, "[w]here the [Commission] has accompanied its ruling with the required full and careful explanation, that ruling is entitled to great deference." *Washington Gas Light Co. v. Public Service Comm'n,* 452 A.2d 375, 379 (D.C.1982), *cert. denied,* ── U.S. ──, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983).[7]

*Metropolitan Washington Board of Trade v. Public Service Comm'n, supra,* 432 A.2d at 351; *Washington Public Interest Organization v. Public Service Comm'n, supra,* 393 A.2d at 75; *see Washington Gas Light Co. v. Baker,* 88 U.S.App.D.C. 115, 118, 188 F.2d 11, 13 (1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951).

5. *See People's Counsel v. Public Service Comm'n, supra,* 399 A.2d at 46 ("The burden of petitioner to demonstrate reversible error is considerable"); *Goodman v. Public Service Comm'n,* 309 A.2d 97, 101 (D.C.1973) ("The burden upon petitioner is not merely to put forth an acceptable alternative but rather to demonstrate clearly and convincingly a fatal flaw in the action taken").

6. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968); *Mississippi River Fuel Corp. v. FPC,* 82 U.S.App.D.C. 208, 214, 163 F.2d 433, 439 (1947).

7. The Commission's findings of fact and conclusions of law must also show that the rate determination was "in accordance with the reli-

III

"Few types of legal proceedings are more complex, intricate and expensive than the full-blown utility rate case, with its myriad problems in valuation, economics, accounting, law and engineering." Foy, *Cost Adjustment in Utility Rate Schedules,* 13 VAND.L.REV. 663, 663 (1960). A utility's fair rate of return for its services[8] is determined "on the basis of evidence presented during a public hearing, and changes in the rate schedule ordinarily cannot be made in the absence of such a hearing." Note, *Due Process and the Automatic Fuel Adjustment Clause,* 52 IND.L.J. 637, 637 (1977) (footnote omitted); *see United States v. Public Service Comm'n, supra,* 465 A.2d at 833. Accordingly, the operating costs incurred by the public utility will be "passed on to the consumer after a general rate hearing before a public service commission which establishes rates based on costs of production and return on investment." Leaffer, *Automatic Fuel Adjustment Clauses: Time for a Hearing,* 30 CASE W.RES.L. REV. 228, 229 (1980). When inflation and cost fluctuations enter the economic picture, however, such formal rate hearings

able, probative, and substantial evidence." D.C.Code § 1–1509(e) (1981); *Washington Public Interest Organization v. Public Service Comm'n, supra,* 393 A.2d at 77; *Chesapeake & Potomac Telephone Co. v. Public Service Comm'n,* 339 A.2d 710, 714 (D.C.1975); *see Telephone Users Ass'n v. Public Service Comm'n,* 304 A.2d 293 (D.C.1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1448, 39 L.Ed.2d 492 (1974).

8. In *FPC v. Hope Natural Gas Co., supra,* the Supreme Court held that "the fixing of 'just and reasonable' rates" under the Natural Gas Act "involves a balancing of the investor and the consumer interests." 320 U.S. at 603, 64 S.Ct. at 288. Such rates must be sufficient to "enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate investors for the risks assumed ...." *Id.* at 605, 64 S.Ct. at 289. Utility rates in the District of Columbia must also be "just and reasonable." D.C.Code § 43–501 (1981).

become inadequate as a means of ensuring a fair rate of return because of the delay inherent in them.

> When prices are rising, the time that necessarily elapses between the date when earnings fall below the permissible minimum rate of return and the date when the commission enters its order allowing increased rates, is a time during which the utility earns less than a fair and reasonable return. . . .

> The inevitable delay between the happening·of an event that entitles a party to legal relief and the date when he gets relief makes it impossible in some kinds of cases for law and equity to do complete justice.

*Lynchburg Gas Co.,* 6 P.U.R.3d 33, 35–36, *additional opinion sub nom. Virginia Electric & Power Co.,* 7 P.U.R.3d 108 (Va.Corp. Comm'n 1954), *aff'd sub nom. City of Norfolk v. Virginia Electric & Power Co.,* 197 Va. 505, 90 S.E.2d 140 (1955), quoted in Comment, *The Fuel Adjustment Clause and Its Role in the Regulatory Process,* 47 Miss. L.J. 302, 306 (1976). *See generally* Blair & Kaserman, *Automatic Cost Fuel Adjustment Clauses: Issues and Evidence,* Pub. Util.Fort., November 25, 1982, at 27; Schiffel, *Electric Utility Regulation: An Overview of Fuel Adjustment Clauses,* Pub.Util. Fort., June 19, 1975, at 23. Thus, in order to deal with this regulatory lag,[9] techniques

have been developed to simplify the rate-making process. "One such technique is a provision which, without formal proceedings, increases or decreases utility rates in proportion to increases or decreases in an operating expense." Foy, *supra,* 13 Vand.L. Rev. at 663. Among the most common of these provisions is the fuel adjustment clause (FAC) in electric utility rate schedules.[10]

■ A fuel adjustment clause, which allows the utility to pass its fuel costs directly to the consumer without a public hearing, "solve[s] the cash flow dilemma resulting from regulatory lag and eliminates the public expense of lengthy administrative hearings." Leaffer, *supra,* 30 Case W.Res.L. Rev. at 230 (footnote omitted); *see* Note, *supra,* 52 Ind.L.J. at 638–639.[11] Under such a clause, "the electric rate is increased or decreased by a fixed amount for each increase or decrease over or under a certain 'base cost' per unit of coal, natural gas or other fuel consumed in the generation of electricity." Foy, *supra,* 13 Vand.L.Rev. at 663. A similar adjustment clause, based on the cost to distributors of purchasing gas, may be found in natural gas schedules. This purchased gas adjustment clause "operates more precisely than the FAC because the commodity purchased is merely resold without transformation into a different

**9.** One commentator has described the effect of regulatory lag as follows:

> In these times of rapidly increasing fuel costs, it has become apparent that regulatory lag may cause serious cash flow problems for the utility, further decreasing its earnings, lowering the rate of return on its investments, and negatively affecting the price of its stock. These consequences, in turn, damage the company's credit rating, ultimately affecting its ability to raise necessary capital in the debt market. Lower bond ratings then lead to higher utility prices as the increased cost of long term debt filters through the company's financial structure, finally appearing on its rate schedule. This increase in the cost of capital has also forced some utilities to stop paying dividends which, again, is reflected in lower stock prices.

Leaffer, *supra,* 30 Case W.Res.L.Rev. at 229–230 (footnotes omitted).

**10.** "The earliest examples of FAC's were the 'temporary' wartime clauses litigated during the inflationary period of the First World War. In spite of opposition, they were in widespread use by the mid-1920's. By the end of World War II, they were generally accepted as part of the regulatory process, at least in commercial and industrial rate schedules." Comment, *supra,* 47 Miss.L.J. at 306 (footnotes omitted). "Today, FAC's are found in some form in forty-three states and the District of Columbia." Leaffer, *supra,* 30 Case W.Res.L.Rev. at 233 (*footnote omitted*).

**11.** A certain amount of controversy has always accompanied the use of the fuel adjustment clause. *See* Leaffer, *supra,* 30 Case W.Res.L. Rev. at 233–237; Note, *supra,* 52 Ind.L.J. at 639; Comment, *supra,* 47 Miss.L.J. at 309–313.

form of energy." Leaffer, *supra,* 30 CASE W.RES.L.REV. at 232 n. 24 (citation omitted).

## IV

■ Conceding in its brief that "[t]he D.C.Code contains no express language either granting or denying the Commission authority to approve an automatic fuel adjustment clause," petitioner argues nevertheless that no such authority is implied in any Code provision. We disagree.

D.C.Code § 43–311 (1981) provides the Commission with authority to "regulate, fix, and determine" utility rates and to correct "any rate, toll, charge, regulation, or practice of any public utility ... [that] is unreasonable or discriminatory ...." D.C. Code § 43–903 (1981) states that "[a]ll rates, tolls, charges ... and schedules ... fixed by the Commission ... shall be prima facie reasonable until finally found otherwise ...." The terms "rate," "toll," and "charge" are nowhere defined in the Code. Whether a fuel adjustment clause constitutes a rate, toll, or charge which the Commission is authorized to fix, however, we need not decide. We hold instead that the Commission's authority to permit the use of a fuel adjustment clause in a rate design is included within the "additional, implied, and incidental power which may be proper and necessary to effect and carry out" the Commission's enumerated statutory powers. D.C.Code § 43–103 (1981).

Petitioner contends that a fuel adjustment clause is inconsistent with the system of fixed utility rates required in the District of Columbia and that the Commission's approval of its use is inconsistent with its regulatory obligations. Our attention is called to *State ex rel. Utility Consumers Council v. Public Service Comm'n,* 585 S.W.2d 41 (Mo.1979) (en banc), which in petitioner's view "presents a well-focused, thoughtful and persuasive analysis for use in interpreting the legality of a fuel adjustment clause in the District of Columbia." We remain unconvinced.

In *State ex rel. Utility Consumers Council,* the court reviewed the general powers of Missouri's Public Service Commission and rejected arguments that a fuel adjustment clause was similar to a tax adjustment clause, or that it could be justified under the "sliding scale" provision of the statute. *Id.* at 51–55. The court then observed that the statute specifically empowered the Commission "to fix *maximum* rates," and that to this extent "a fixed-rate rather than a variable-rate system" had been established. *Id.* at 56 (emphasis in original). Thus a fuel adjustment clause which could only work through a variable-rate system would be presumptively disallowed under the statute. The court concluded:

> If the legislature wishes to approve automatic adjustment clauses, it can of course do so by amendment of the statutes, and set up appropriate statutory checks, safeguards, and mechanisms for public participation. As of this date the only exception to the fixed rate system approved by the legislature is a sliding scale rate. We cannot imply an intent to allow a further exception where to do so would upset the fixed-rate system set up in the statutes.

*Id.* at 57. *See also In re Allied Power & Light Co.,* 132 Vt. 354, 321 A.2d 7 (1974) (FAC which was part of an electric rate schedule approved by Public Service Board, and which might result in rates subject to indefinite and irregular variation without advance notice, held to be in violation of statutes requiring notice of rate changes). *Compare In re Green Mountain Power Corp.,* 131 Vt. 284, 305 A.2d 571 (1973) (FAC requiring notice to the Board before any rate increase would take effect held valid).

The restrictive holdings of the Missouri [12] and Vermont courts have not been widely followed; indeed, the weight of authority is against their narrow statutory interpretation. When confronted with challenges to adjustment clauses relating to the purchase of gas by gas companies, courts have uni-

12. Unlike Missouri's statute governing the approval of utility rates, the District of Columbia

Code contains no provision specifying that the Commission must establish maximum rates.

formly held, under statutes similar to ours, that state regulatory agencies had authority to approve such clauses. *E.g., City of Chicago v. Illinois Commerce Comm'n,* 13 Ill.2d 607, 150 N.E.2d 776 (1958); *United Gas Corp. v. Mississippi Public Service Comm'n,* 240 Miss. 405, 127 So.2d 404 (1961); *Montana Consumer Counsel v. Public Service Comm'n,* 168 Mont. 180, 541 P.2d 770 (1975); *City of Norfolk v. Virginia Electric & Power Co.,* 197 Va. 505, 90 S.E.2d 140 (1955). *See also Maestas v. New Mexico Public Service Comm'n,* 85 N.M. 571, 514 P.2d 847 (1973). Similar results have been reached by courts confronted with fuel adjustment clauses for electric power companies. *E.g., Consumers Organization for Fair Energy Equality v. Department of Public Utilities,* 368 Mass. 599, 335 N.E.2d 341 (1975); *State ex rel. Utilities Comm'n v. Edmisten,* 291 N.C. 327, 230 S.E.2d 651 (1976). *But see City of Evansville v. Southern Indiana Gas & Electric Co.,* 167 Ind. App. 472, 339 N.E.2d 562 (1975). We adopt the majority rule and reject the Missouri and Vermont holdings.

■ The provisions of our Public Utilities Act are to be liberally construed. D.C.Code § 43–103 (1981). Thus, given our relatively broad statutory language and guided by the decisions of other courts interpreting similar statutes, we hold that the Commission had the power to permit PEPCO to use a fuel adjustment clause as a component of its rate schedule.[13]

### V

■ Petitioner's second main contention is that PEPCO's use of a fuel adjustment clause constitutes retroactive ratemaking and is therefore invalid. Specifically, petitioner argues that the FAC "guarantees the dollar-for-dollar recovery of costs incurred in a previous period, requiring ratepayers to fund past deficits . . . ." Petitioner erroneously equates adjustment of future rates on the basis of past costs with recoupment of past losses. The case law makes clear that the former is permissible, but the latter is not.

"It is . . . a cardinal principle of ratemaking that a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle." *Nader v. FCC,* 172 U.S.App.D.C. 1, 21, 520 F.2d 182, 202 (1975) (citation omitted); *see Chesapeake & Potomac Telephone Co. v. Public Service Comm'n,* 330 A.2d 236, 240 (D.C. 1974); *Public Service Co. v. FERC,* 195 U.S. App.D.C. 130, 143, 600 F.2d 944, 957, *cert. denied,* 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); *Payne v. Washington Metropolitan Area Transit Comm'n,* 134 U.S.App.D.C. 321, 330, 415 F.2d 901, 910 (1968). This principle has often been applied in the federal regulatory context to prohibit retroactive rate-making in cases arising under the Federal Power Act, *e.g., FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956), and the Natural Gas Act, *e.g., FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 152–153, 83 S.Ct. 211, 215–16, 9 L.Ed.2d 199 (1962).

■ In rejecting the argument that approval of a purchased gas adjustment clause by the State Corporation Commission permitted the utility to engage in retroactive ratemaking, the Supreme Court of Virginia has stated:

> The Commission does not have the power to redetermine rates for a past period at a different level from those actually charged in accordance with filed sched-

---

13. Petitioner also argues that a fuel adjustment clause is neither a "price stated or fixed" nor a "specific unit or standard," which it assertedly must be in order to pass muster under *Bird v. Chesapeake & Potomac Telephone Co.,* 185 A.2d 917 (D.C.1962). Petitioner's reliance on *Bird* is misplaced. All that we held in *Bird* was that the Commission's decision to limit the telephone company's liability for omissions in tele- phone directory listings was not tantamount to an increase in the company's rate. Thus, as respondent correctly points out in its brief, *Bird* "is irrelevant to the question of whether the Commission has statutory authority to permit a fuel adjustment clause, because the sole issue [there] was whether a non-monetary provision, the limitation of liability, was a rate."

ules because that would be to make retroactive rates....

In approving the escalator clause the Commission did not fix rates retroactively, but on the contrary, it authorized and presented a fixed mathematical formula to be inserted in the schedules of the company which will serve as a "guide, direction, or rule of action" for determining future rates.

*City of Norfolk v. Virginia Electric & Power Co., supra,* 197 Va. at 516, 90 S.E.2d at 148 (citations omitted); *see United Gas Corp. v. Mississippi Public Service Comm'n, supra,* 240 Miss. at 444, 127 So.2d at 421. *See also Public Service Co. v. FERC, supra,* 195 U.S.App.D.C. at 146, 600 F.2d at 960. The same can be said of the fuel adjustment clause approved by the Commission in the instant case.

The FAC at issue here is based on a three-month moving average method of calculating fuel costs. Under this method, estimated fuel costs for two of the months in the FAC formula for a billing period become actual fuel costs when the formula is employed again to determine the FAC for a subsequent billing period. The FAC, however, remains but one component of a rate design approved by the Commission. As the Commission noted in its Final Opinion and Order No. 7428, "[A]pproval ... of a fuel adjustment clause renders it applicable to fuel consumed in the future to produce energy." There is no retroactive ratemaking in the operation of the fuel adjustment clause because the utility is not attempting to recoup past losses through present rate designs.

The order of the Public Service Commission approving the use of a fuel adjustment clause is therefore

*Affirmed.*