441 So.2d 565 (1983)
ALABAMA METALLURGICAL CORPORATION, et al.
v.
ALABAMA PUBLIC SERVICE COMMISSION, et al.
ALABAMA TEXTILE MANUFACTURERS ASSOCIATION
v.
ALABAMA PUBLIC SERVICE COMMISSION, et al.
Annie Bell ADAIR, Johnetta Daniels, Napolean Turner, Rosa Lee Turner, Alice Elmore, and Nettie Pendleton
v.
ALABAMA PUBLIC SERVICE COMMISSION.
Charles A. GRADDICK, as Attorney General of the State of Alabama, on behalf of the STATE of Alabama and the affected customers of Alabama Power Company
v.
ALABAMA PUBLIC SERVICE COMMISSION.
Charles A. GRADDICK, as Attorney General of the State of Alabama, on behalf of the STATE of Alabama and the affected customers of Alabama Power Company
v.
ALABAMA PUBLIC SERVICE COMMISSION.
82-272, 82-273, 82-274, 82-276 and 82-284.
Supreme Court of Alabama.
September 16, 1983.
*567 James D. Brooks and Patricia Olney, Mobile, for appellants Alabama Metallurgical Corp. and Alabama Textile Manufacturers Assoc. (82-272 and 82-273).
Stanley Weissman for Legal Services Corp. of Alabama, Inc., Montgomery, for appellants Annie Bell Adair, et al. (82-274).
Charles A. Graddick, Atty. Gen. and Wendell Cauley and Charles A. Guyton, Asst. Attys. Gen. for appellants Graddick, etc., et al. (82-276 and 82-284).
Euel A. Screws, Jr. of Copeland, Franco, Screws & Gill, and Debra Biggers, Montgomery, for appellee Alabama Public Service Com'n.
Thomas W. Thagard, Jr. of Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, John Bingham, Rodney O. Mundy, Steven G. McKinney and Dan H. McCrary of Balch, Bingham, Baker, Hawthorne, Williams & Ward, Birmingham, and Robert E. Steiner, III of Steiner, Crum & Baker, Montgomery, for appellee Alabama Power Co.
EMBRY, Justice.
These are direct appeals by rate case intervenors from rate orders of the Alabama Public Service Commission (PSC or the Commission) dated 17 and 22 November 1982. The orders approved for Alabama Power Company (the Company), Rates RSE and CNP and special rules related to those rates.
These are unlike recent appeals of rate orders. Generally, the appellant from a rate order is the utility. Appellants in this case are consumers who took part in the PSC's hearings on the adoption of Rates RSE and CNP and now object to its orders enacting these rates. They are: (1) Charles A. Graddick as Attorney General (the Attorney General); (2) Alabama Metallurgical Corporation, et al. (Alabama Metallurgical); and Annie Bell Adair, et al., represented by Legal Services Corporation of Alabama, Inc. (Legal Services). Section 37-1-140, Code 1975 (Supp.1982), grants the right to appeal directly to this court from orders of the PSC.

I.
Prior to consideration of the merits of this appeal, we will examine the history of this case and explain the rate formulae enacted.

*568 PSC Docket No. 18117

On 19 March 1981, Alabama Power Company filed new retail electric rate schedules designed to provide approximately $325,000,000 in additional revenues annually. The PSC suspended the filed rates and ordered an investigation and hearings, thus creating Docket No. 18117. The appellants participated with the Company and other parties in those hearings.
At the conclusion of those proceedings the PSC issued a "zero" order, dated 16 October 1981, denying the Company any revenue increase whatsoever. The Company appealed that order on the day it was issued and, on 19 October 1981, filed an application for supersedeas with this court seeking authority to implement its filed rates under bond, subject to refund. By order dated 12 February 1982, this court granted partial supersedeas.
After this court's 12 February supersedeas order, and a new rate filing by the Company, the PSC initiated discussions among the parties to Docket No. 18117 regarding resolution of that case and the new filing by means of ratemaking concepts embodied in Rates RSE and CNP. During these discussions, which occurred 25 March through 14 April 1982, all parties participated in the development of a settlement proposal based upon Rate RSE, Rate CNP and certain related special rules, all of which have now become the subject of this appeal. Despite efforts made during these public meetings, settlement was not reached by mid-April and the PSC suspended the new rates which had been filed by the Company and scheduled further hearings.

PSC Docket No. 18416
On 9 March 1982, the Company filed with the PSC new retail electric rate schedules designed to provide approximately $129,000,000 in additional annual revenues above the rates filed in Docket No. 18117. After suspension of the filed rates, the PSC held hearings in which the Company, appellants, and other parties participated.
On 15 October 1982, the PSC issued an order which denied the Company's filed rates but retained jurisdiction. It requested that the parties withhold any appeals and directed them to resume negotiations. The PSC gave notice and conducted public hearings for that purpose beginning 3 November 1982.

Consolidation of Dockets Nos. 18117 and 18416
Upon consideration of the merits of the Company's appeal of Docket No. 18117, this court determined the PSC's "zero" rate order of 16 October 1981 to be confiscatory. On 6 November 1982, it reversed and remanded the order to the PSC with instructions to set new nonconfiscatory rates by no later than 1 December 1982. Alabama Power Co. v. Alabama Public Service Commission, 442 So.2d 767 (Ala.1982).
After hearings, for the receipt of evidence on 11 and 12 November 1982 in the consolidated matter of both the remanded Docket No. 18117 and Docket No. 18416, the PSC issued an order setting new rates for the Company and adopting Rate RSE, Rate CNP and certain related special rules. Five days later, the Commission issued its order and opinion of 17 November 1982 with its findings and reasoning in support of its earlier ratemaking decision. After receiving new rate schedules filed by the Company pursuant to the PSC's previous order, the PSC issued an order dated 22 November 1982, approving those filed rate schedules as being in compliance with the orders of 12 and 17 November 1982. The Commission's orders of 17 and 22 November are, respectively, Appendix I and II to this opinion.
The appellants, intervenors in both dockets resolved by the PSC's rate orders of 17 and 22 November, challenge its adoption of Rate RSE, Rate CNP, and the special rules relative to those rates.

Rate RSE
Rate RSE is a mathematical formula designed by the PSC, its staff and the Company. It contemplates numerous expense items taken from the Company's uniform *569 system of accounts in determining the kilowatt-hour charge to be applied to the customer's usage. While it is complex in application, the theory behind the rate is not difficult to understand.
"RSE" is an acronym for Rate Stabilization and Equalization. It represents a ratemaking formula designed to provide periodic revenue adjustments (increases or decreases) calculated to allow the Company to earn 15% return on its common equity capital. In this connection, rate RSE is responsive to this court's order in Alabama Power Co. v. Alabama Public Service Commission, 422 So.2d 767 (Ala.1982), which ordered the PSC to establish rates which were not confiscatory. In that case, this court stated a 15% return on equity to be the minimum which would not result in confiscation of the Company's property. 422 So.2d at 773. We also emphasized any rate of return formula established by the PSC should be prospective, rather than retrospective, in nature. 422 So.2d at 770.
Under Rate RSE, Company revenues are adjusted in the following manner: At predetermined dates in 1983 (February 1 and October 1) and 1984 (quarterly), the Company's actual rate of return on year-end common equity is measured by the formula contained in Rate RSE using figures from the Company's records. The Company's records must be maintained in accordance with the uniform system of accounts prescribed by the PSC. If the Company's retail return on common equity is within the equity return range, no adjustment of charges is made under Rate RSE. If the return is either above or below the range, an adjustment limited to a specific percent of total revenue is made in order to move the return toward 14%, the adjusting point specified in Rate RSE.
There are several limiting factors incorporated in Rate RSE. First, if the Company's retail return on equity exceeds 15%, Rate RSE requires a downward revenue adjustment.
Second, no matter how much upward revenue adjustment is needed to reach an appropriate level of return, on equity, each adjustment is limited to a specified percentage of total revenues. This limiting factor was designed to lessen the harsh effect of utility rate increases on the consumer and encourage the Company to operate efficiently.
Third, any growth in the Company's common equity ratio in excess of 2½% per year cannot be considered in the adjustment. This provision ensures the Company will not inject common equity into the enterprise capital in an effort to generate revenue increases.
Fourth, a number of expenses are excluded from the operation of Rate RSE. Advertising expenses, lobbying expenses, and charitable donations cannot be considered; neither can club dues, nor a portion of the salaries of the Company's executive officers. Thus, Rate RSE excludes from its operation, expenses of the Company which have been customarily excluded in rate proceedings, plus certain expenses which were considered in rate adjustments prior to Rate RSE.
The special rules governing Rate RSE require increased PSC monitoring of Company operations over past current levels of reporting, auditing, and inspection. These rules require the Company to provide certain reports and documents to the PSC, its staff, and the Attorney General in advance of any adjustments under Rate RSE. The rules further provide that the PSC can initiate complaint proceedings for the purposes of inquiring into the amount, accuracy or compliance with uniform system of accounts of any expenditures or entry utilized in the Rate RSE formula calculation.

Rate CNP
Rate CNP is an acronym for Certificated New Plant. It is designed to adjust monthly billings beginning with the second month after a certificated generating plant goes into commercial operation. The rate adjusts the Company's charges to prevent nosedives in the Company's earnings which would otherwise occur when such a plant is placed into commercial operation. By so *570 doing, it allows the Company to earn a current return on the new electric generating plant.
This rate was formulated by the PSC in response to this court's holding in Alabama Power Co. v. Alabama Public Service Commission, 422 So.2d 767 (Ala.1982), that the Commission must allow the Company a return on plant which it has specifically authorized the Company to build in order to serve retail electric customers. We held it was error for the Commission to ignore the impact on the Company's business of a certificated new plant.

II.
Regulation of utility rates is purely a function of the legislature. The courts have expressedly rejected any notion that the judicial branch has the authority or duty to set rates. Continental Telephone Co. of the South v. Alabama Public Service Commission, 427 So.2d 981, 984 (Ala.1982). Rather, it is the role of the judiciary to ensure that the Commission, in carrying out its regulatory function, has exercised its legislative powers within constitutional limits. City of Birmingham v. Southern Bell Telephone and Telegraph Co., 234 Ala. 526, 532, 176 So. 301, 305 (1937).
Traditionally, this court has afforded a broad scope of review in cases where the utility has alleged confiscation of its property in violation of its constitutional rights. Alabama Power Co. v. Alabama Public Service Commission, 390 So.2d 1017 (Ala.1980). Most recently, however, even this broad scope of review has been limited by the court in Alabama Gas Corp. v. Alabama Public Service Commission, 425 So.2d 430 (Ala.1982). In that case, this court held that a mere allegation of confiscation will no longer be sufficient and that an affirmative showing of confiscation is required to invoke this court's broad scope of review.
Furthermore, it has been the long established law in this jurisdiction that a consumer has no property right in a given level of utility rates. As stated in City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301 (1937):
"[C]ounsel for the city insists that a rate that is too high confiscates the subscriber's property ... and that of consequence a constitutional question is as much presented on the part of the subscriber as on the part of the utility.... The argument is ingenious, but not sufficiently persuasive. If such a theory be accepted, then all rate-making legislation is reviewable and revisable by the courts, for to determine the matter as to the subscriber a full consideration of all the facts and circumstances in every instance would be necessary. A rate fixed by the Legislature would be as much the subject of attack by the subscriber as one fixed by the commission. Ours is a representative form of government and the legislature represents the people of the state who are subscribers to telephone service.
"It would follow, as a logical result of the theory advanced by the city, that a subscriber who has no invested capital at stake, but only a desire for a lower rate, and dissatisfied with the schedule fixed in the law passed by his representatives in the Legislature, could appeal to the courts to have the law nullified, and a new schedule of rates established by the judicial branch of our government, and thus have the court's judgment in a purely legislative matter substituted for that of the lawmaking body. Manifestly, such a result would run counter to our present form of government...." (Emphasis added.)
234 Ala. at 533, 176 So. at 306.
This has been the holding of courts in other jurisdictions as well. Georgia Power Co. v. Allied Chemical Corp., 233 Ga. 558, 212 S.E.2d 628 (1975); Norwegian Nitrogen Products v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); Sellers v. Iowa Power & Light Co., 372 F.Supp. 1169 (S.D.Iowa 1974); State v. Public Service Commission, 532 S.W.2d 20 (Mo.1975).
Accordingly, here, the court must apply a narrow scope of review. As stated in this court's prior order in this case, the *571 inquiry under the narrow scope of review "ordinarily goes no further than to ascertain there is evidence to support the findings of the Commission." Alabama Power Co. v. Alabama Public Service Commission, 422 So.2d 767, 769 (Ala.1982). See also Alabama Gas Corp. v. Wallace, 293 Ala. 594, 602, 308 So.2d 674, 677-78 (1975).
The Commission's order, and Rates RSE and CNP as prescribed therein, come to this court with a presumption of correctness and validity. The Legislature stated the presumption as follows:
"All rates, fares, charges ... and orders establishing rules, regulations, practices or services fixed by the commission shall be in force and shall be deemed prima facie reasonable and valid in any court wherein the reasonableness or validity thereof is properly drawn in question, and the burden shall be on the party attacking said rates or orders to show that same are invalid or unfair and unreasonable."
Section 37-1-99, Code 1975.
Further, it is established law in this jurisdiction that an administrative body's interpretation of its authorizing legislation is entitled to great weight. State v. Southern Electric Generating Co., 274 Ala. 668, 151 So.2d 216 (1963). If it is determined that the Commission acted within its authority and its order is supported by evidence and the rates are reasonable and fair, then the order of the Commission is due to be affirmed.

III.
With these principles of review in mind, we consider the merits of this appeal. There are three primary inquiries in this case: (1) Whether the PSC acted outside its statutory authority; (2) Whether the PSC denied due process to the intervenors, and (3) Whether the PSC's findings are based on the substantial weight of the evidence.
First, we will consider whether adoption of Rates RSE and CNP, rather than use of traditional ratemaking methodologies to adjust the Company's rates, is outside the PSC's statutory ratemaking powers.
All three appellants argue, in varying ways, that the PSC is restricted, by statute, to the use of traditional rate making methodologies, and cannot adopt fixed rate formulae such as Rates RSE and CNP. They have indicated no specific provision of the Code which precludes the PSC from the adoption of rates such as RSE and CNP. Rather, they argue the Legislature has enacted a detailed system of procedures for filing, notice, suspension, intervention, and hearings which is violated upon each operation of Rates RSE and CNP to adjust the utility's rates. They further argue the PSC has contracted away its regulatory authority by adopting these rates and making a commitment not to change the rates prior to 1984.
The regulatory and ratemaking powers delegated to the Commission by the Legislature are broad and exclusive. The Commission may utilize any "administrative consideration or device" to set rates so long as the constitutional standards embodied in the statute are satisfied. The adjustment clauses contained in Rates RSE and CNP, like the fuel adjustment clause, are rate-fixing devices adopted by the Commission pursuant to its statutory authority and duty to fix rates. §§ 37-1-31, 37-1-32, 37-1-80, Code 1975 (Supp.1982); Alabama Power Co. v. Alabama Public Service Commission, 422 So.2d 767 (Ala.1982); Memorandum Opinion and Order on Supersedeas, Case No. 81-48, February 12, 1982; Zeigler v. Blount Brothers Construction Co., 364 So.2d 1163 (Ala.1978); City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S.E.2d 140 (1955).
The appellants' mistaken characterization of the nature of Rates RSE and CNP has led to several erroneous conclusions regarding the operation of the rates within the traditional ratemaking structure. RSE and CNP are fixed rate formulae. Courts throughout the United States have recognized the distinction between a fixed formula and the mathematical factors or adjustments, which are the mathematical *572 products of the operation of that formula. These courts have held that the formula is the rate as opposed to the mathematical computations under the formula.
In City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S.E.2d 140, 148-49 (1955), a classic case of first impression on this point, the Supreme Court of Appeals of Virginia stated:
"The General Assembly has ... `recognized that rate schedules consist not merely of lists of rates in dollars and cents, but that they customarily include provisions that will in various ways affect the rates charged at the time of filing or to be charged thereafter.'
"The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money."
See, e.g., State ex rel. Utilities Commission v. CF Industries, Inc., 299 N.C. 504, 263 S.E.2d 559 (1980); Application of Kauai Electric Division of Citizens Utilities Co., 60 Hawaii 166, 590 P.2d 524 (1978); State ex rel. Utilities Commission v. Edmisten, 291 N.C. 327, 230 S.E.2d 651 (1976); City of Los Angeles v. Public Utilities Commission, 15 Cal.3d 680, 125 Cal.Rptr. 779, 542 P.2d 1371 (1975); Consumers Organization For Fair Energy Equality, Inc. v. Department of Public Utilities, 368 Mass. 599, 335 N.E.2d 341 (1975); Montana Consumer Counsel v. Public Service Commission, 168 Mont. 180, 541 P.2d 770 (1975); In re Board's Investigation of Telephone Companies v. New Jersey Bell Telephone Co., 66 N.J. 476, 333 A.2d 4 (1975); City of Chicago v. Illinois Commerce Commission, 13 Ill.2d 607, 150 N.E.2d 776 (1958); Cherokee County Electric Coop. v. Public Utility, 618 S.W.2d 127 (Tex.Civ.App.1981).
The Fifth Circuit Court of Appeals recently recognized that the Federal Energy Regulatory Commission, under a similar statutory scheme, was free to adopt a detailed formula rate such as Rate RSE, noting that "FERC is not `bound to a single ratemaking method or formula, but is free to make pragmatic adjustments in its methods.' " Louisiana Public Service Commission v. Federal Energy Regulatory Commission, 688 F.2d 357, 360 (5th Cir.1982). Finally, it should be remembered that the "end result" controls the judicial inquiry in this matter. As stated by the United States Supreme Court:
"We held in Federal Power Commission v. Natural Gas Pipeline Co. [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942)], supra, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its ratemaking function, moreover, involves the making of `pragmatic adjustments'... and when the Commission's order is challenged in the Courts, the question is whether that order `viewed in its entirety' meets the requirements of the act.... Under the statutory standard of `just and reasonable' it is the result reached not the method employed which is controlling.... It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 602 [64 S.Ct. 281, 287-88, 88 L.Ed. 333] (1944)."
In short, Alabama's "file and suspend" statute comes into play only when a utility seeks a change in rates. Even then, notice and a hearing are not required for a filed rate to become effective. Because the formulae of Rate RSE and Rate CNP are fixed and the operation of those formulae is in nowise a change in rates, no filing is required and, thus, there is nothing for the Commission to consider suspending for the purposes of investigation. As always, *573 the Commission's statutory complaint jurisdiction (§ 37-1-83) is available to any ratepayer or the Commission itself for an investigation into the fairness or reasonableness of any utility rate, including Rates RSE or CNP.
That a fixed rate formula is statutorily authorized as a ratemaking tool in Alabama is evidenced by the fact that the PSC has utilized various adjustment clauses over a long period of time. While this is not conclusive evidence of the harmony of such a formula with the Alabama statutory scheme, a consistent construction by the PSC over a long period of time commands great respect from this court, and is entitled to great weight in determining the propriety of the procedure. State v. Southern Electric Generating Co., 274 Ala. 668, 151 So.2d 216 (1963).
The fact that § 37-1-81(a) (formerly Title 48, § 53) was reenacted without change in the present codification of the Alabama Code lends further support to the interpretation that the statute does not prohibit the use of fixed rate formulae. "The weight to be given an administrative interpretation is increased when the Legislature, in reenacting the law fails to indicate in any way its disapproval of the settled administrative construction." State v. Southern Electric Generating Co., 274 Ala. 668, 670, 151 So.2d 216, 217 (1963).
The more serious allegation is that the PSC has avoided its regulatory responsibility by its commitments to make no change in Rates RSE and CNP and the underlying rate schedules before the end of 1984. The PSC's order provides:
"(9) It is the intent of this order to avoid the large general retail rate increase requests so characteristic of recent years, with the attendant delays and lengthy, expensive proceedings. It is therefore the commitment of the Company, by its acceptance of this rate order, to make no further general retail rate increase filings in the years 1982, 1983 and 1984, nor request any changes in the Equity Return Range to be effective prior to January 1, 1985. It is likewise the commitment of the Commission, by reason of the Company's agreement to the complete and final disposition of these two dockets and its acceptance of the other limitations hereunder, to make no change in Rate RSE or Rate CNP nor reductions in the rate schedules to which they apply, to be effective at any time before the end of 1984. It is, however, expressly recognized that an unforeseen calamity, whether physical or economic, of the nature of force majeure may occur. In such event, the Company and the Commission shall consult in good faith to determine whether such commitments should be modified and, failing agreement thereon, the parties may take such actions as in good conscience they deem appropriate." (Emphasis added.)
The Commission's "commitment" that it will make no change in Rates RSE and CNP before the end of 1984 is a recognition by the Commission that the rates must be given sufficient opportunity in operating to determine whether they should be extended or modified. Its commitment is based upon, and contingent upon, the Company's commitment to file no further general rate increase in 1982, 1983 and 1984. The order recognizes that Rates RSE and CNP may be modified in the light of "unforeseen calamity, physical or economic."
This court has recognized that lawful rates may be prescribed for an approved period of time. T.R. Miller Mill Co. v. Louisville & Nashville Railroad Co., 207 Ala. 253, 92 So. 797 (1921). Code section 37-4-22 ("Contract Rates") also recognizes that the Commission may approve a rate applicable for a prescribed period of time, the Legislature apparently seeing no "contracting away of regulatory responsibilities" as being involved in such an action.
Thus, appellants' arguments that the new rates reduce the Commission's regulatory responsibilities is without merit. Limited complaint proceedings provided for by the rates are in addition to the rights the Commission has under the statute. The monitoring procedures which have been established *574 by the Commission indicate a greater regulatory responsibility on the part of the Commission and its staff than heretofore assumed.
This is noted in the PSC's order of 17 November 1982:
"With the exception of the commitment of the Commission to make no change in Rate RSE and Rate CNP and the underlying rate schedules before the end of 1984, as provided above in this paragraph (9), it is understood and agreed that no provision in this order nor any provision in Rate RSE, Rate CNP or the related Special Rules shall be construed:
"(a) as restricting in any manner the Commission in the exercise of its regulatory rights, powers, authority, jurisdiction and duties over Alabama Power Company as provided in Title 37, Code of Alabama (1975), as amended;
"(b) as restricting in any manner the Attorney General of the State of Alabama in the exercise of his duties and responsibilities as provided in Title 37, Code of Alabama (1975), as amended, with regard to public utilities and specifically Alabama Power Company; or
"(c) as restricting in any manner the complaint procedures as provided in Code of Alabama (1975), as amended, Sections 37-1-83, et seq."

Thus, because the Rates RSE and CNP are the rates and have been enacted according to appropriate statutory ratemaking procedures for filing, notice, suspension, intervention, and hearings, there is no violation of statutory procedural requirements upon each adjustment under the rates. Further, the fact that the rates have been prescribed for a period of time is not a "contracting away of regulatory responsibilities." This is especially true where, as here, the PSC has actually taken upon itself additional regulatory responsibilities in enacting the rate and rules attached thereto.
We must also acknowledge that Rates RSE and CNP are the PSC's responses to this court's recent mandates. In its 12 February 1982 order in Alabama Power Co. v. Alabama Public Service Commission, supra, this court stated that "there is no legal requirement for the Commission to establish a `test year,'" even though the establishment of a test year may be a helpful device for carrying out the requirements imposed on the PSC to determine rates which are fair. It was further emphasized that the PSC was free to use any "administrative considerations or devices" to set rates so long as the constitutional standards embodied in the statute were satisfied. This court, in its 5 November 1982 order in Alabama Power Co. v. Alabama Public Service Commission, supra, held that 15% return on equity was the minimum which would not result in confiscation of the Company's property. The PSC was bound to apply our findings with regard to these cases and did so by the adoption of Rates RSE and CNP.

IV.
Next, we will consider the constitutional claims of the appellants: (1) Whether the rates and special rules are prohibited phased increases; and, (2) Whether the intervenors were afforded statutorily specified rights to due process of law.
Appellants contend the Commission's adoption of Rates RSE and CNP constitute an illegal "phasing," in violation of this court's order in Alabama Power Co. v. Alabama Public Service Commission, 390 So.2d 1017 (Ala.1980). In that case, the Commission found a revenue deficiency for the Company of $208,000,000, but entered an order allowing remedy of this deficiency in three separate steps. This court found the Commission could not phase in a total dollar rate increase over a period of time and the Company's properties were being confiscated during the interim period. This ruling was based upon the need to protect the Company's constitutional right to obtain just compensation for the public use of its private property. Because appellants have no property rights at stake in the operation of the challenged rates, they have no standing to raise a "phasing" argument. City of Birmingham v. Southern Bell Telephone & *575 Telegraph Co., 234 Ala. 526, 176 So. 301 (1937).
Moreover, Rates RSE and CNP are not "phasing." Rate CNP is a rate designed to immediately respond to any loss of earnings resulting from placing new plants in service. That rate cannot, by any stretch of the imagination, be called a "phased" increase.
Similarly, Rate RSE, because the formula contained therein is the rate, is not phasing. Unlike the situation in Alabama Power Co. v. Alabama Public Service Commission, supra, the Commission has not ordered a partial rate increase or new and different rate schedules to become effective in the future. The operation of Rate RSE to adjust revenues upward or downward cannot be equated with the "phasing" in of an increase to remedy, in steps, a revenue deficiency.
Second, appellants argue they were not afforded due process of law because of not being given an opportunity to present evidence or conduct cross-examination at the hearings on Rates RSE and CNP. A review of the transcripts makes obvious that dictates of due process have been met by the Commission in its consideration of these rates and that all parties were afforded a fair opportunity to present evidence and have the case decided on the basis of the evidence presented.
The Commission's findings, supportive of its adoption of Rates RSE and CNP, are based upon the evidence adduced at hearings in PSC Docket Nos. 18117 and 18416. These hearings spanned a period of twenty (20) months. Appellants were presented with the concept and details concerning Rates RSE and CNP at least nine months prior to the adoption of these rates.
The Commission sent notice to all parties, prior to the November 1982 hearings, that the hearing should be held to "explore a possible settlement of rates for the company... including, but not limited to, consideration of Rate RSE and Rate CNP, as discussed at length by these same parties beginning in March of this year." The notice further stated that the "Commission will hear any party wishing to present comments and evidence relating to these matters." Appellants all acknowledge receipt of this notice.
All appellants appeared at the November hearings and presented comments regarding Rates RSE and CNP. They cross-examined the witnesses presented by the Company. That they did not chose to present a witness to address the operation of RSE and CNP is not a denial of due process to them. We find they had sufficient notice and sufficient opportunity to present witnesses and to cross-examine any witnesses presented by the Company.

V.
Lastly, we must consider the issue whether Rates RSE and CNP are just and reasonable and are supported by proper evidence as is required by § 37-1-80, Code 1975.
We find that every material aspect of Rates RSE and CNP have foundation in the evidence of record before the Commission. The records established in Docket Nos. 18117 and 18416 prior to their consolidation contain extensive testimony and documentary evidence of the Company's inability to earn the returns on common equity allowed by the Commission's previous orders and this court's mandate.
Substantial testimony was presented at the November hearings in support of the adoption of the fixed formula rates. With regard to the operation of the rates, the Commission received the testimony of Bruce Hutchins, the Company's Assistant Treasurer and General Manager of Finance. During the Attorney General's cross-examination of Hutchins, he itemized the monetary impact on consumers of each operation of the rates. Hutchins testified as to the rates' effects on the monthly bill of an average residential customer, and the total revenue impact of these rates.
The PSC's order is further supported by the testimony of David A. McClahahan and Oscar E. Walker, the Company's cost of service and rate design witnesses. Substantial evidence presented by these men demonstrates *576 the fairness and reasonableness of Rates RSE and CNP. Their testimony indicates that, under these rates, each of the three major classes of the Company's customers will pay rates which correlate to the Company's cost of providing service to that particular class.
Most importantly, this court's orders in two immediately previous rate case appeals by the Company confirm that the Commission's previous ratemaking methodologies were inadequate to fulfill its responsibilities to set fair rates.
Thus, in light of the evidence of record in Docket Nos. 18117 and 18416, the evidence introduced in the November hearings after the consolidation of these Dockets, and this court's previous mandates, it is plain that the Commission's adoption of Rates RSE and CNP is based on the record and is reasonable and fair to both the consumer and the Company.

VI.
We have examined Rates RSE and CNP and the special rules related thereto and find that they are legal and proper in every respect, they represent an appropriate exercise of the PSC's regulatory authority, they are in compliance with this court's mandate, and they are just and reasonable both to Alabama Power Company and to consumers represented by the Alabama Public Service Commission. We approve the Commission's orders of 17 and 22 November 1982, adopting Rates RSE and CNP and the rules related thereto. Therefore, those orders are due to be, and are hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES and ADAMS, JJ., concur.
BEATTY, J., concurs in part and dissents in part.
 ) APSC Docket No. 18117
 ) (Upon Remand from the
 ) Supreme Court of Alabama)
 ALABAMA POWER COMPANY, )
 ) APSC Docket No. 18416
 Petitioner. ) (Petition for Approval of
 ) New Schedules of Rates and
 ) Charges for Retail Electric
 ) Service)

OPINION AND ORDER
BY THE COMMISSION:
In accordance with paragraph (5) of the Commission's order dated November 12, 1982, the Commission hereby enters this opinion and order in the above-styled dockets, subject to review of the rate schedules filed in response hereto.
By order dated November 5, 1982, the Supreme Court of Alabama reversed the Commission's order dated October 16, 1981 in Docket No. 18117. That proceeding was remanded to the Commission with directions regarding the Commission's legal duty to grant the Petitioner, Alabama Power Company ("the Company"), sufficient rates as to provide the Company a fair, non-confiscatory return on its property devoted to the public service. These directions and findings by the Supreme Court of Alabama are similarly applicable to the Commission's consideration of the Company's most recent request for a change in its retail rate schedules, which request, though denied by order dated October 15, 1982, remains the subject of hearings and settlement negotiations in Docket No. 18416. In accordance with the instructions of the Supreme Court, and after public hearings held on various dates to receive comments and evidence regarding the rates which will be effective under the provisions of this order, the Commission deems it in the public interest to enter, and hereby does enter, this order regarding the revenue requirements and electric service rates of the Company, based upon the following considerations.
The Supreme Court of Alabama, in its Memorandum Opinion and Order dated February 12, 1982 (Docket No. 18117), found in its "Summary of the Facts" as follows:
It is uncontroverted:
(1) That the APSC is the duly elected body, charged with the quasi-legislative duty of fixing rates.
(2) That the APSC authorized and approved the construction of Farley II.

*577 (3) That the APSC adopted the accounting procedures specified in the Uniform System of Accounts and that `[t]he evidence supports the Company's claim that the accounting treatment required subsequent to July 31, 1981, on Farley II will reduce the earnings of the Company by approximately $4 million per month because of the reduction of the AFUDC income credit.' See Appendix A, APSC Response to specific questions.
(4) That the zero APSC order of October 16, 1981, allows the Company no return on Farley II.
(5) That the APSC has invited the Company to file a new rate proceeding to consider Farley II.
(6) That the order of the APSC does not allow the Company a rate of return on investment of over $4 Billion within the range testified to as being reasonable by witnesses who appeared before the Commission, neither does it allow a rate of return deemed reasonable by the APSC.
(7) There was no contention made, nor was there a finding, that the Company was inefficiently operated.
(Memorandum Opinion and Order, pp. 5 and 6, footnote omitted.)
In its Opinion dated November 5, 1982 in Docket No. 18117, the Supreme Court made additional findings which, as a matter of law, we are bound to apply in our final resolution of Docket Nos. 18117 and 18416. These findings and directions, as quoted from the Court's order, include the following:
A consideration which overrides these issues of legislative function, delegation, and limited judicial review, however, is the constitutional question of whether the commission's order operates to deprive the company of its property without just compensation or due process of law. (Order dated November 5, 1982, at pp. 5-6).
`The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory. * * *.' (Order dated November 5, 1982, at p. 6).
Not only has the company in this case properly alleged and argued confiscation, but also the record clearly shows that the order is confiscatory. (Order dated November 5, 1982, at p. 7).
The company filed projections with the commission of its rate of return both with no rate increase and with the full requested increase. These figures have been accurate to within about half a percentage point until the July, August and September figures for the full increase. The projected figures were 13.89, 14.66, and 15.59 respectively, and the figures based on actual results were 12.84, 13.66, and 14.98 as shown above. The projected return for the year ended October 1982 was 16.72%; these most recent figures suggest the company would not have received this return with the full requested increase. (Order dated November 5, 1982, at pp. 9-10).
This highlights the fact that the commission ignores the requirement that the rates it sets must be prospective. (Order dated November 5, 1982, at p. 10).
If rates are prospective, they must correspond to the actual needs of the company during the time they are in effect. (Order dated November 5, 1982, at p. 13).
Under the undisputed evidence in this case and our review of the record a 15% return on equity is the minimum which would not result in confiscation (Order dated November 5, 1982, at pp. 14-15).

*578 [T]he company has another rate increase pending before the commission [APSC Docket No. 18416]. The commission on remand should consider the updated evidence and establish rates which are not confiscatory. The evidence and the monthly reports submitted to this Court clearly show that the company has been suffering confiscation of its property for some time. Therefore, the commission is hereby ordered to issue a new order as soon as possible, and in no event later than December 1, 1982. (Order dated November 5, 1982, at p. 15).
The Commission acknowledges these findings and directions of the Court. Following the Supreme Court's Memorandum Opinion on Supersedeas dated February 12, 1982, the Commission met with all parties in Docket No. 18117 in several lengthy public sessions in March and April, 1982, during which the concepts of Rates RSE and CNP were developed and discussed, at length. After the Court's Opinion and Order of November 5, 1982, the Commission again met in public hearings with the parties in Docket Nos. 18117 and 18416 and again discussed, at length, the concepts and operations of Rates RSE and CNP, including taking testimony thereon.
The rates herein established and approved, together with the adjustments therein provided for, are fixed in response to these findings, directions and other evidence of record in Docket Nos. 18117 and 18416. Specifically, the Commission finds:
(1) The Supreme Court has ruled that the Commission's order in Docket No. 18117 regarding the Company's investment in Unit No. 2 of the Farley Nuclear Plant ("Farley II") was in error as a matter of law and that the Company was entitled to supersede the Commission's order (Supersedeas Order dated February 12, 1982).
(2) The Supreme Court has further ruled that the Commission's order in Docket No. 18117 is confiscatory, and that a 15% return on average common equity is the minimum, under the evidence in that docket, which would not result in confiscation. In addition, the Court found that the Company has been suffering confiscation of its property for some time, and emphasized throughout its opinion that the Commission must establish rates which are prospective and adequate to meet the actual needs of the Company during the time such rates are in effect (Order dated November 5, 1982).
(3) The law entitles the Company to rates which will allow it a reasonable opportunity to earn a fair net return upon the reasonable value of its property devoted to the public service. Because the rates of return provided for the debt and preferred stock capital supporting the Company's rate base are contractually fixed, a measure of the fairness of a given set of rates and charges is the rate of return earned on the Company's common equity capital.
(4) The evidence (Docket Nos. 18117 and 18416) shows that the Company has not earned on a consistent basis the rates of return on common equity allowed by this Commission in past rate cases. This phenomenon is unique to the electric utility industry in general and to the Company in particular and has resulted in part from the construction program of the Company over the past decade and the bringing of new plants on line. In order to give the Company an opportunity to earn a rate of return on equity within an acceptable range on a consistent or timely basis, this Commission, with agreement of the Company, has adopted new concepts called Rate RSE (Rate Stabilization and Equalization) and Rate CNP (Certificated New Plant) which are intended to meet the Company's basic financial needs and, at the same time, be just and reasonable to the public.
(5) The Commission finds that the adoption of Rate RSE and Rate CNP, as developed through negotiation with the Company during public hearings, is an innovative application of a concept which is familiar to the Commission because of its experience with the historic use of energy adjustment clauses. The Commission finds that the ratemaking principles reflected in Rate RSE and Rate CNP, as attached hereto and adopted herein, constitute a significantly *579 improved method of setting electric utility rates sufficient to provide the Company with stable and adequate returns, to provide the public with the lowest possible rates consistent with the cost of service, to ameliorate the impact of increases required, and to decrease rates promptly if the designated rates of return are exceeded. The reasoning supporting the adoption of Rate RSE and Rate CNP, based upon evidence presented in Docket Nos. 18117 and 18416, and during public hearings held in conjunction therewith, is as follows:
(a) Rate RSE gives the Company a better opportunity to earn a fair return by allowing limited periodic adjustments (increases or decreases) in the Company's total retail electric revenues in direct response to changes in the Company's actual recorded costs under the Uniform System of Accounts as reflected in the Company's actual rate of return on year-end common equity. The operational mechanics, restrictions and administration of Rate RSE are set out in detail in the language of the rate itself, Appendices A and B thereto and the Special Rules Governing Operation of Rate RSE and Rate CNP (as contained in Exhibit 63), which are attached hereto as Appendix 1.
(b) The standardized accounting procedures, the established range of year-end common equity rates of return, and the limitations contained in Rate RSE and the Special Rules will operate to protect against rates that are in any way excessive by requiring a downward adjustment to the Company's revenues and retail electric rates in the event the Company's rate of return to year-end common equity exceeds the designated range.
(c) The operation of Rate RSE and Rate CNP will tend to stabilize electric rates and increase retail electric revenues gradually, thus avoiding the impact of the larger rate requests characteristic of past ratemaking practices.
(d) Successful operation of Rate RSE and Rate CNP will help restore the Company's financial integrity and insure reliable electric service to meet the growing needs of industrial, commercial and residential electricity consumers in Alabama.
(e) The formal rate hearings which have occupied the Commission perennially in recent years have proven to be too costly, too lengthy, and generally unsatisfactory for determining the Company's retail revenue needs. The operation of Rate RSE and Rate CNP will reduce the scope and frequency of major rate cases before the Commission and thus allow the Commission and its Staff to monitor more closely the daily operations of the Company and to devote Commission resources to the investigation and resolution of regulatory problems previously unaddressed.
(f) Because the Commission will be able to increase its monitoring of the Company's operations and because Rate RSE is designed to allow a range of equity rates of return (with the adjustments calculated to restore the Company only to the designated adjusting point within the range), with limited increases in revenue only periodically, the Company will have a strong incentive to resist cost increases and maintain efficiencies. Stable earnings should enable the Company to use management planning devices to implement available economies.
(g) Because Rate RSE operates on the basis of a comprehensive, actual and timely evaluation of all the Company's costs of providing service, customers will continuously receive the benefit of all the Company's combined economies and will receive an effective communication of the actual cost of the Company's service, thereby promoting better informed decision-making and conservation by the customers.
(6) The Commission finds that Rate RSE contains several devices agreed to by the Company which will operate to protect the Company's ratepayers from being charged excessively, to-wit:
(a) Charges are reduced when the Company's earned rate of return on year-end common equity exceeds the "cap" represented by the upper limit of the specified Equity Return Range.

*580 (b) There is no Rate RSE adjustment when the rate of return on year-end common equity is anywhere within the specified Equity Return Range.
(c) Further "caps" limit the impact of any one adjustment. These are provided by the percentage limitations effective in each period when an adjustment is due to be made.
(d) Accumulations of new common equity in excess of that amount which constitutes a 2-½ percentage points improvement in the Company's common equity ratio over the ratio of the previous calendar year will not be recognized in the formulary calculations required under Rate RSE. This provision constitutes a further "cap" and a protection against increases created solely by adding common stockholder investment unrelated to other cost-of-service considerations.
(e) Rate RSE prevents the recognition of certain "below-the-line" expenses for the purpose of calculating the Rate RSE factor for each period and limits the recognition of certain executive salary and advertising expenses.
(f) As provided in the Special Rules, in any inquiry into the amount, accuracy and compliance with the Uniform System of Accounts or into any material change in accounting treatment of expenditures and book entries of the Company utilized in the computation of the Rate RSE adjustments, the burden of proof as to the amounts and verification of expenditures shall be upon the Company.
(g) The Company's agreement to this complete and final disposition of these two dockets, as required by the order which led to the adoption of Rate RSE and Rate CNP, operates to the benefit of all those concerned with the time and expense involved in the prosecution of such proceedings.
(h) To a like advantage is the commitment of the Company, upon the considerations and conditions detailed herein, to make no further general retail rate increase filings in the years 1982, 1983 and 1984, nor request any changes in the Equity Return Range to be effective prior to January 1, 1985.
(7) The Commission finds that Rate CNP will respond to the Supreme Court's Supersedeas Order and the Order of November 5, 1982, and will mitigate further earnings deterioration caused by certificated new plants coming "on-line" without revenues to offset the related cessation of Allowance for Funds Used During Construction (AFUDC). To compensate for such effects, Rate CNP adjusts charges beginning with the second month after such a plant goes into commercial operation and is devoted to Alabama retail electric service. The Commission finds the elements of Rate CNP, as attached hereto and adopted herein, and the rate's intended operation to be just and reasonable in all respects and in the public interest. The rate should prevent future nosedives in the Company's earnings such as that experienced at the time Farley II came "on-line" during the progress of Docket No. 18117.
(8)(a) The Commission finds that rates of return on year-end common equity in the range of 13.5% to 15.0% (the "Equity Return Range") are not excessive. The Commission and the Company have recognized that such Equity Return Range represents a targeted range of earned rates of return based upon year-end common equity rather than average common equity. Because a year-end equity return for the Company is approximately one-half of a percentage point (.5%) below the return on its common equity averaged over such year, the specified Equity Return Range gives the Company a reasonable opportunity to earn the 15% return on average common equity required under the Court's Order of November 5, 1982. This range is also consistent with the evidence in Docket No. 18416. Further, the Company submitted projections showing operating results under the provisions of Rates RSE and CNP (Exhibit 64), which projections demonstrated that the Company should in fact be able to earn a 15.0% return on average common equity. In this regard, the Commission notes that the Company's projections have proven to be accurate in the past, and were embraced by the Supreme *581 Court in its Order of November 5, 1982.
(b) The Commission also finds that an increase for the Company in total retail electric revenues of eight percent (8%) over the level collected under the Court's Supersedeas Order of February 12, 1982 in Docket No. 18117 is fully supported by the evidence in that docket and in Docket No. 18416, and will not result in an excessive return to the Company.
(c) The Commission also finds that the monthly customer service charge to be contained in Rate FD should be $7.00 per month (effective for December 1, 1982 billings), which charge is below that otherwise justified by the Company's cost-of-service study in Docket No. 18117 and even below the Company's filed customer charge of $8.00 in Docket No. 18416. The Commission is of the opinion that $7.00 per month is a moderate customer charge and is beneficial to many lower income ratepayers, a number of whom are in the poverty class. In addition, the Commission directs the Company to waive the above-specified customer service charge for those customers who, upon application with the Company, show themselves to be qualified recipients of Supplemental Security Income and (1) who are over the age of 65, or (2) are blind, or (3) are disabled, as certified by the Department of Pensions and Security. The Commission finds that this discount for such qualified recipients is a just and reasonable means of assisting the Company's low-income elderly and/or handicapped customers, many of whom have difficulty in meeting their basic energy needs. In addition, the Commission observes that the Weatherization Program presented by the Company has potential merit for future implementation, and the Company is instructed to study this and other similar programs and be prepared to respond to future Commission inquiries regarding the possible implementation of such programs.
(d) Further, the Commission finds that adjustments (increases or decreases) during specified periods of 1983 pursuant to Rate RSE to achieve an earned rate of return in the Equity Return Range are to be limited in total amount to an adjustment of no more than the following percentages of the Company's total retail electric revenues:

 For any adjustment effective February 1 2%
 For any adjustment effective October 1 2%

and that such limitations are fair and reasonable. The Commission also finds reasonable a limitation applicable for the year 1984 limiting each of the adjustments (increases or decreases) to achieve the targeted equity rate of return to no more than the following percentages of the Company's total retail electric revenues:

 For any adjustment effective January 1 2%
 For any adjustment effective April 1 1%
 For any adjustment effective July 1 1%
 For any adjustment effective October 1 1%

Any quarterly adjustments (increases or decreases) effective January 1, 1985 and thereafter shall each be limited to 2% of total retail electric revenues.
The foregoing limited periodic adjustments allow the Company a better opportunity eventually to earn a rate of return within the Equity Return Range designated above, while assuring customers that rates would be reduced should the Company earn a rate of return on its year-end common equity above the designated Equity Return Range. The percentage limitations provide a further protection for the customers against the burdens of inflation while furnishing the Company with the incentive to hold increases in its costs within the level of inflation generally.
(9) It is the intent of this order to avoid the large general retail rate increase requests so characteristic of recent years, with the attendant delays and lengthy, expensive proceedings. It is therefore the commitment of the Company, by its acceptance of this rate order, to make no further general retail rate increase filings in the years 1982, 1983 and 1984, nor request any changes in the Equity Return Range to be effective prior to January 1, 1985. It is likewise the commitment of the Commission, by reason of the Company's agreement to the complete and final disposition of these two dockets and its acceptance of the *582 other limitations hereunder, to make no change in Rate RSE or Rate CNP nor reductions in the rate schedules to which they apply, to be effective at any time before the end of 1984. It is, however, expressly recognized that an unforeseen calamity, whether physical or economic, of the nature of force majeure may occur. In such event, the Company and the Commission shall consult in good faith to determine whether such commitments should be modified and, failing agreement thereon, the parties may take such actions as in good conscience they deem appropriate.
Further adjustments under Rate RSE and/or Rate CNP may continue after January 1, 1985 pursuant to an affirmative vote of the Commission. The Commission anticipates that, and one may expect that, with satisfactory experience, Rates RSE and CNP will continue in effect in 1985 and thereafter. It should be recognized that the effect of such operation may well be to stabilize or decrease rates rather than increase rates.
With the exception of the commitment of the Commission to make no change in Rate RSE and Rate CNP and the underlying rate schedules before the end of 1984, as provided above in this paragraph (9), it is understood and agreed that no provision in this order nor any provision in Rate RSE, Rate CNP or the related Special Rules shall be construed:
(a) as restricting in any manner the Commission in the exercise of its regulatory rights, powers, authority, jurisdiction and duties over Alabama Power Company as provided in Title 37, Code of Alabama (1975), as amended;
(b) as restricting in any manner the Attorney General of the State of Alabama in the exercise of his duties and responsibilities as provided in Title 37, Code of Alabama (1975), as amended, with regard to public utilities and specifically Alabama Power Company; or
(c) as restricting in any manner the complaint procedures as provided in Code of Alabama (1975), as amended, Sections 37-1-83, et seq.
(10) Certain rate design matters must be addressed:
(a) Several witnesses presented testimony in these dockets regarding the appropriate demand allocation methodology to be used in connection with the determination of the Company's retail cost of service. After considering the evidence on this issue and our prior application of a coincident peak demand allocator reflecting the average of 12 monthly coincident peaks (12-CP), the Commission finds that the 12-CP methodology is most appropriate for use in separating the Company's total electric investment and expenses between regulatory jurisdictions. The Commission finds that this methodology best reflects not only the Company's monthly system peak demand, but also its dependable generation capacity, maintenance schedules, firm purchases, firm sales and other relevant operating conditions.
(b) The rate schedules to be filed by the Company shall reflect a revenue distribution among the Company's three basic customer classes that is very similar to the revenue distribution proposed and supported by the Company through its filed rates in Docket No. 18416. In the design of such rate schedules, the Company is directed to give consideration to the commercial class so as to move the return for this class closer to the return for total direct service than was provided for in the rate schedules last established by this Commission. Rate schedules so designed will generate class rates of return that are not disparate when compared on an indexed basis with the rate of return for total direct service indexed as 1.0. The evidence in Docket No. 18416 shows that the indexed rates of return for each class fall within a reasonable tolerance band and, more importantly, the revenue distributions accomplished by the rate schedules ordered herein will move each class return closer to unity with total direct service. While cost-of-service ratemaking is important, the principle of gradualism must be applied to avoid disruptive changes to the Company's rate schedules. The Commission finds that the basic rate design of *583 the schedules ordered herein will be fair and reasonable to all classes of customers and not unduly discriminatory to any class.
(c) Traditionally, the Alabama Industrial Group, whose members are HLF and LPL customers of the Company, has protested at length regarding the comparative rates of return among the Company's major customer classes. Such complaints have again been raised in these two dockets; however, as noted above, the Commission finds that the differences between such indexed class rates of return are not discriminatory or unfair to any class of customers, nor will the revenue distribution ordered herein create any such unfairness or discrimination. Indeed, the Commission has found that the relative class rates of return are moving closer together, reflecting a proper movement toward cost-of-service based rates, tempered with the concept of gradualism.
(11) Considering the high unemployment rate prevailing in Alabama, the Commission finds there is an urgent need to stimulate employment in the State. The Commission hereby encourages Alabama Power Company to increase its activity in the area of industrial development and aggressively pursue new and expanded industry which will create employment opportunities. In order to help attract new labor intensive industry into its service area and to encourage present labor intensive industry to expand, the Commission encourages the Company to modify its standard electric service provisions to allow negotiations of terms and conditions of service so as to create an incentive, as justified and where needed, to secure the location of labor intensive industry in its service area. Any service under a special contract will be subject to Commission review and approval. Such industry would be served pursuant to the applicable prescribed rate schedules of the Company.
THE PREMISES CONSIDERED, and upon further consideration of the entire record in these two dockets, the Commission FINDS that the rates and rate revisions herein discussed and ordered: (1) are just and reasonable, and (2) neither separately nor in the aggregate will enable the Company to earn more than a fair net return on the reasonable value of its property devoted to the public service. IT IS, THEREFORE, ORDERED THAT:
(1) The Company's retail electric rate schedules filed with the Commission pursuant to the February 12, 1982 Supersedeas Order of the Supreme Court of Alabama are not excessive and are found to be the lawful rates for the billings thereunder through November 30, 1982.
(2) Said supersedeas rates being the lawful rates, the Company is entitled to retain the retail electric revenues collected or to be collected under the Court's Supersedeas Order dated February 12, 1982 in Docket No. 18117. This Order does not result in any obligation to refund any of the revenues collected or to be collected by the Company under the Supersedeas Order. The Commission specifically approves and joins in the Company's anticipated request to the Supreme Court of Alabama for the discharge of the supersedeas bonds filed with the Court in Supreme Court Case No. 81-48 (APSC Docket No. 18117).
(3) The Company is entitled to an eight percent (8%) increase in its total retail electric revenues over the level being collected under the currently effective supersedeas rates. The Company is directed to file rate schedules and Special Rules Governing the Application of Commercial and Industrial Rates which will provide approximately said eight percent (8%) increase over the retail revenues in the 12 months ended April, 1982, normalized to include the supersedeas entitlement. Said rates, when filed and reviewed, will be effective for all December 1, 1982 billings and thereafter. It is specifically recognized that Rate ECR (Energy Cost Recovery), Rate T (Tax Adjustment), Rate PAE (Purchase of Alternative Energy), Rate Rider RT (Temporary or Temporary Emergency Service), and all Special Rules governing the applications of specific rate schedules shall continue in effect as previously approved by this Commission.
*584 (4) Rate RSE, Rate CNP and the Special Rules Governing Operation of Rates RSE and CNP, attached hereto as Appendix 1 and made part of this order, shall be incorporated by reference in the respective schedules ordered above. Said Rate RSE, Rate CNP and such Special Rules are in all respects APPROVED as just and reasonable, and shall become effective along with the rate schedules which incorporate them. It is recognized that, by its own terms, Rate RSE provides that the initial adjustment by application of the factor developed thereunder shall be effective for billings on February 1, 1983 and thereafter.
(5) Rate RSE and Rate CNP (and also Rate ECR and Rate T, as previously approved and presently in effect) shall operate concurrently but independently to provide the respective adjustments in charges (increases or decreases) provided for by such rates.
(6) The Company shall comply fully with the tax normalization accounting requirements of the Economic Recovery Tax Act of 1981 and related rules and regulations for so long as said Act, rules and regulations remain the law of the United States. It is recognized that the rates approved and established herein fully reflect tax normalization accounting, as required by this Act.
(7) The Company shall indicate its acceptance of this order and its provisions in writing by a filing with the Commission within three (3) working days of the date hereof.
DONE this 17th day of November, 1982 at Montgomery, Alabama.
 ALABAMA PUBLIC
 SERVICE COMMISSION
 /s/ Billy Joe Camp
 Billy Joe Camp, President
 /s/ Lynn Greer
 Lynn Greer, Associate
 Commissioner
 /s/ Jim Folsom, Jr.
 Jim Folsom, Jr., Associate
 Commissioner
 ATTEST: A true copy
/s/ Wallace Tidmore
Wallace Tidmore,
Secretary
Attached and incorporated:
Appendix 1: Rate RSE and Rate CNP and Special Rules Governing Operation of Rates RSE and CNP
Reporter's Note: Appendix 1 to this opinion and order of the Public Service Commission was not incorporated into the Supreme Court's Appendix 1.
 ) APSC Docket No. 18117
 ) (Upon Remand from the
 ) Supreme Court of Alabama)
ALABAMA POWER COMPANY, )
 )
 Petitioner ) APSC Docket No. 18416
 ) (Petition for Approval of
 ) New Schedule of Rates and
 ) Charges for Retail
 ) Electric Service)

ORDER APPROVING FILED RATE SCHEDULES
BY THE COMMISSION:
Pursuant to Commission directions and its order dated November 12, 1982, Alabama Power Company filed with the Commission and distributed to the parties rate schedules and certain special rules related thereto which were designed to comply with the previously issued directions and order. In addition, Attachment 1 to the Company's filing letter identified several currently effective rate schedules and related special rules which are not affected by the Commission's previous order and which remain effective and unchanged hereunder.
After review of the Company's filing by the Commission and its Staff, the Commission FINDS that the Company's rate schedules and special rules, including those which are unchanged, are in compliance with this Commission's orders dated November 12, 1982 and November 17, 1982 and are in all respects due to be approved and made applicable for billings on December 1, 1982 and thereafter.
IT IS, THEREFORE, ORDERED that the following rate schedules and special rules, as filed by the Company on November 17, 1982, are hereby APPROVED in all *585 respects and shall be effective for billings on December 1, 1982 and thereafter:
FD Family DwellingResidential Service
FPL Unmetered Protective Lighting
HLF HighLoad Factor Industrial Power
LAF Lighting Athletic Fields
LFS Farm Service
LPEM Restricted Light and Power Service (Medium)
LPEL Restricted Light and Power Service (Large)
LPS Light and Power Service (Small)
LPM Light and Power Service (Medium)
LPL Light and Power Service (Large)
OFP Oil Field Industrial Power
PG Power for Cotton Gins and Peanut Drying Operations
RN Rate RiderNighttime Capacity
RS Rate RiderShort-term Service Optional
SLM Public Street and Highway Lighting
TS Traffic Signal Service
XTP* ManufacturingRestricted
XWP* Off-peak Water Works Pumping (Restricted)
RSE Rate Stabilization and Equalization
CNP Certificated New Plant
SSI Supplemental Security Income Recipient
Special Rules Governing Operation of Rates RSE and CNP
Special Rules Governing the Application of Commercial and Industrial Rates
The annual interruptible credits are increased to $27.60 per KVA and to $30.60 per KW.
* Availability of rates indicated by asterisks is limited to current customers with such rates.
Rates ECR (Energy Cost Recovery), PAE (Purchase of Alternative Energy), RSU (Supplemental or Standby Service), RT (Temporary or Temporary Emergency Service), T (Tax Adjustment), and the Special Rules Governing the Application of Rate FD (Family Dwelling-Residential Service), PAE (Purchase of Alternative Energy), SLM (Public Street and Highway Lighting), and TS (Traffic Signal Service) have not been changed.
DONE this 22nd day of November, 1982, at Montgomery, Alabama.
 ALABAMA PUBLIC
 SERVICE COMMISSION
 /s/ Billy Joe Camp
 Billy Joe Camp, President
 /s/ Lynn Greer
 Lynn Greer, Associate
 Commissioner
 /s/ Jim Folsom, Jr.
 Jim Folsom, Jr., Associate
 Commissioner
 ATTEST: A true copy
/s/ Wallace Tidmore
 Wallace Tidmore,
 Secretary
BEATTY, Justice (concurring in part and dissenting in part):
I concur with the majority under the facts of this case that the intervenors were afforded due process with regard to notice, hearings, and the opportunity to present evidence and cross examine witnesses. Further, I agree that the rates adopted were fair and reasonable. With regard to the other issues, they are substantially the same as those presented in Graddick v. Alabama Public Service Commission, 441 So.2d 586 (1983). I adhere to the views expressed in my dissent in that case.